IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

KEITH HOWARD, THE HOWARD
COMPANY OF THE SOUTHEAST,
INC., AND HOWARD ROCK FEE,
LLC,

       Appellants/Cross-Appellees,

v.

ROGER MURRAY, K&H
DEVELOPMENT GROUP, INC., A
FLORIDA CORPORATION, AND
BLA-LOCK DESTIN
DEVELOPMENT GROUP, INC., A
FLORIDA CORPORATION,

       Appellees/Cross-Appellants,

WALTON COUNTY, FLORIDA,

       Appellee.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NOS. 1D14-1841, 1D14-1984 &
1D14-1996

_____/

Opinion filed November 9, 2015.

An appeal from the Circuit Court for Walton County.
David W. Green, Judge.

Donald A. Mihokovich and Quinn A. Henderson of Adams and Reese, LLP, Tampa, for Appellants/Cross-Appellees.

Charles P. Hoskin of Emmanuel, Sheppard and Condon, Pensacola, for Appellee/Cross-Appellant Roger Murray; Lisa S. Minshew of Lisa S. Minshew, P.A., Pensacola, for Appellees/Cross-Appellants K & H Development and Bla-Lock Destin Development.

Carly J. Schrader, Gregory T. Stewart, and Heath R. Stokley of Nabors, Giblin & Nickerson, P.A., Tallahassee, for Appellee Walton County, Florida.

BENTON, J.

The final judgment before us[1] was entered in cases consolidated below, in which the trial court ruled that development rights within the Sandestin Development of Regional Impact (DRI) run with the land: The trial court decided that "the issuance of a deed or other instrument of conveyance carries with it the ownership of a reasonable portion of intensity rights" and that "the amount of intensity allowed for a parcel must be determined based upon the individual circumstances of the development." We conclude this approach is unworkable and reverse the final judgment in part on this basis.

---

[1] After Howard filed its notice of appeal (No. 1D14-1841), Murray filed two notices of appeal (Nos. 1D14-1984 and 1D14-1996) addressed to the same trial court judgment, giving rise to what was originally treated as three separate appellate proceedings. No. 1D14-1841 was assigned to this panel, and Nos. 1D14-1984 and 1D14-1996 were assigned to a different panel. The parties did not move to consolidate the appeals. Oral argument was never requested in No. 1D14-1841, but took place in Nos. 1D14-1984 and 1D14-1996 on May 12, 2015, before the other panel. Thereafter the court sua sponte consolidated the three appeals and transferred Nos. 1D14-1984 and 1D14-1996 to this panel to be treated as they should have been originally filed: as cross-appeals in No. 1D14-1841. This panel has reviewed the archived video recording of the oral arguments held in Nos. 1D14-1984 and 1D14-1996.

2

The focus of the parties' dispute is 1.453 acres located within the Sandestin DRI in South Walton County (Tract 3) which has been a subject of contention between Keith Howard, The Howard Company of the Southeast, Inc., and Howard Rock Fee, LLC (Howard/Howard parties), on the one hand, and Roger Murray, K & H Development Group, Inc., and Bla-Lock Destin Development Group, Inc. (Murray/Murray parties),[2] on the other, over a period of some years.

The final judgment decided that Bla-Lock "has vested commercial development intensity rights in its 1.453 acre parcel of real property," quieted title to the real property "along with associated commercial intensity development rights" in Bla-Lock against Howard, and decreed that Sandestin Investments, LLC (a non-party) "is authorized to confirm to the appropriate Walton County officials that development intensity rights are available to Bla-Lock," whereupon Walton County could issue a permit to Murray for building on the lot. An earlier summary judgment, also reviewable now that final judgment has been entered, had disposed of other claims.

We affirm the summary judgment in favor of Howard on Murray's claims of tortious interference with a business relationship, fraudulent misrepresentation, negligent misrepresentation, and civil theft. We also affirm the trial court's dismissal of Murray's causes of action for inverse condemnation as not ripe for

_____

[2] Roger Murray owns K & H Development Group, Inc. (K & H), and Bla-Lock Destin Development Group, Inc. (Bla-lock).

decision. We reverse both the summary judgment in favor of Murray on Howard's claim of tortious interference with an option Howard had on Tract 3 (and the underlying business relationship the option represented) and the final judgment determining Bla-Lock Destin Development Group, Inc. holds vested (albeit unspecified) development rights in Tract 3 that entitle it to a development order at this time.[3] We cannot agree with the learned trial judge that development rights created by an order authorizing a development of regional impact but never allocated—by the development order or otherwise—to a specific subparcel are automatically conveyed when the subparcel is deeded.

Aggregate Development Rights Created and Assigned

By the time Walton County entered a development order authorizing the Sandestin DRI on some 2300 acres, Evans & Mitchell Industries, Inc., the original applicant, had gone bankrupt. Property subject to the development order was subdivided among various mortgage holders. After 1976, ownership of the DRI

---

[3] We do not hold, however, that Murray is precluded from acquiring development rights in addition to development rights already allocated to Parcel 208/308. See § 380.06(19), Fla. Stat. (2015) (addressing procedures for proposed change to a previously approved DRI). Any "developer" may submit a notice of proposed change to a DRI order. See § 380.06(19)(a); (f)2., Fla. Stat. "Developer" is defined to mean "any person . . . undertaking any development as defined in this chapter." § 380.031(2), Fla. Stat. (2015). "The term 'development' means the carrying out of any building activity or mining operation, the making of any material change in the use or appearance of any structure or land, or the dividing of land into three or more parcels." § 380.04(1), Fla. Stat. (2015). Because this administrative remedy has not been exhausted, we express no view on the merits of any change to the DRI order that may hereafter be proposed.

4

property fragmented further,[4] before all owners of undeveloped property subject to the original DRI agreed to the Sandestin Declaration of Covenants, Conditions and Restrictions (CCR), recorded in the Walton County land records in 1980.

After it had acquired all the assets of Lakeland B.V., including its development rights under the DRI order,[5] Sandestin Corporation submitted its 1984 Master Plan Update, notifying Walton County that "the Sandestin Corporation and its affiliates [had] succeeded in reestablishing unified development control" and requesting modifications to the DRI order. Accordingly, by Resolution 1984-24, Walton County amended the initial DRI development order, so that Parcel 208/308 consisting of 48.1 acres, including Tract 3, was allotted 550,000 square feet of commercial development rights.

<u>Legal Title to Tract 3 Changes Hands</u>

On December 1, 1984, Sandestin Corporation agreed to sell approximately 16 acres lying within Parcel 208/308, including Tract 3, to Great Southwest

---

[4] Lakeland B.V. owned most of the property at that time. Two other entities, developers of existing subdivisions, joined in the CCR Declaration. In 1981, Lakeland B.V. assigned its development rights under the DRI order to Sandestin Corporation.

[5] In 1998, Sandestin Corporation conveyed its assets and assigned its rights under the DRI order in turn to Intrawest Sandestin Company, L.L.C. In March of 2010, Intrawest Sandestin sold its assets and assigned its rights under the DRI order to Sandestin Investments, LLC.

Commercial, Inc.[6] The sales contract, which was explicitly subject to the DRI order and the CCR, provided that the parties would agree on necessary amendments to the CCR and, on July 1, 1985, a Supplemental Declaration to the CCR was in fact executed. This Supplement to the CCR did not, however, purport to allocate development rights among lots or parcels lying within the 16-acre parcel Sandestin Corporation agreed to sell (or elsewhere within Parcel 208/308's 48.1 acres).[7]

By 1992, Centaworld Corporation had obtained title to the 16-acre parcel, including Tract 3.[8] On February 1, 1996, Centaworld Corporation conveyed Tract 3 to Centaworld Holding Corporation (Centaworld Holding). After Centaworld Holding executed a first mortgage in favor of Peoples First Community Bank (Peoples First), encumbering Tract 3, to secure a loan of approximately

---

[6] On July 1, 1985, Sandestin Corporation conveyed approximately 16 acres, including the 1.453-acre tract, to Mark E. Bentley, Trustee by warranty deed. The Trustee then conveyed the same property to Cliff Creek Crossing Venture c/o Great Southwest Commercial. Both deeds were recorded on July 2, 1985. Neither deed references DRI development rights.

[7] We agree with the trial judge "that the language in the Great Southwest contract even if read together with the Supplemental Declaration, does not constitute a transfer of right, but merely a representation that no violation of ordinance or restriction imposed by the developer would be violated by the construction of a 150,000 square foot shopping center" and "that no deed or other document of conveyance specifically mentioned a transfer of intensity rights from Sandestin to Murray or his predecessors in title."

[8] In 1991, Bank One filed a foreclosure action and obtained a certificate of title to the Great Southwest property. On November 22, 1991, by special warranty deed, Bank One conveyed the property to the 208/317 Corporation. On August 18, 1992, the 208/317 Corporation deeded the property to Centaworld Corporation.

$227,000.00, Howard obtained an option to purchase Tract 3 (among other parcels) from Centaworld Holding.[9]

Under the terms of the option, Howard paid $150,000 for the right to purchase various subparcels in Parcel 208 at prices calculated to equal (roughly) the debts encumbering the respective, optioned parcels.[10]   After the option was

---

[9] With the exception of Tract 3, Howard eventually acquired all of the property described in the option contract. On June 4, 1999, Howard filed suit against Centaworld and John R. Gardner (owner of the Centaworld entities) for declaratory judgment and for specific performance of the option.  This litigation was settled by conveyance to Howard of optioned property then titled in the names of John R. Gardner, individually, and Centaworld Corporation, subject to all outstanding mortgages and other encumbrances.  On June 8, 2000, Howard filed suit against Centaworld Holding for specific performance of the option as to the two remaining parcels.  On September 7, 2000, Centaworld Holding agreed to convey to Howard the only remaining property covered by the option that was still titled in its name, but not Tract 3, which by this time had been conveyed by quitclaim deed to K & H Development Group, Inc.

[10] The option agreement provided:

> 1.   Property: Howard agrees to buy and Centaworld agrees to sell that certain land located within Tract 208 Sandestin Resort . . . . Parcel 1 consists of approximately 1.453 acres ("Tract A"). . . .
>
> The Purchase Price for Tract A is Two Hundred Thirty Five Thousand Dollars ($235,000) plus the release price, which shall not exceed $265,000, as determined by Jay Odom, holder of a mortgage encumbering Tract A. . . . In no event shall the total purchase price paid for all Tracts exceed Two Million Nine Hundred Fifteen Thousand Dollars. . . .  Purchase Prices shall be payable as follows:
>
> A. Option Payment:  Simultaneous with the execution of this agreement by all parties, Howard shall pay to Centaworld the sum of One Hundred Fifty Thousand Dollars ($150,000.00) as an option payment to be applied

executed (but before Howard recorded a "Memorandum of Option"), Murray lent several hundred thousand dollars to Centaworld Holding, securing the loan with a second mortgage encumbering some of the property described in the option contract, including Tract 3.

Peoples First initiated proceedings to foreclose the first mortgage on Tract 3 on February 25, 1999,[11] and, on May 27, 1999, Centaworld Holding filed for Chapter 11 protection in bankruptcy court. On September 1, 1999, Peoples First assigned its Tract 3 mortgage to Murray. After the bankruptcy case was dismissed, Centaworld Holding conveyed its interest in Tract 3 to K & H Development Group, Inc. by quitclaim deed on May 9, 2000.

---

to Centaworld's Equity as listed in Exhibit B . . . .

    B. Loan Payments: For a period of six (6) months following the conclusion of the Inspection Period, Centaworld will be responsible for loan payments to the lenders as set forth in Exhibit "B" attached here (the "Loan Payments"). Thereafter, Howard will be responsible for the Loan Payments thereafter until closing or the termination of this Agreement. . . .

    . . . .

3. Closing: Closing on Tracts A, B and C shall occur no later than eighteen (18) months of the Effective Date, provided; however, the debts itemized in Exhibit B to Jay Odom and Peoples First Community Bank shall be paid in full within twelve (12) months of the execution of this agreement. . . .

"Tract A" referred to in the option is the property referred to elsewhere in this opinion as Tract 3.

[11] Murray was named as a defendant in foreclosure proceedings as holder of the second mortgage. Howard was also named as a defendant because of the Memorandum of Option.

As holder of the first and second mortgages on Tract 3, Murray initiated a foreclosure action against K & H in 2004. At the foreclosure sale, both Murray and Howard bid repeatedly on Tract 3. Murray made the winning bid of $2,625,000.00, then assigned purchase rights to Bla-Lock, and the Walton County Clerk of Court issued a certificate of title to Bla-Lock on May 27, 2008.

Development Rights Dealt with Separately

On October 28, 1999, Intrawest Sandestin filed a Notice of Proposed Change (NOPC) to the DRI order. (By then Intrawest Sandestin had succeeded to Sandestin Corporation's rights under the DRI order, as amended.) This change, approved by Walton County Ordinance No. 2000-03, stated the total projected available development rights for Parcel 208/308 as 398,000 square feet of retail and 40,000 square feet of office space (based on transfers of intensity of 152,000 square feet of retail and 40,000 square feet of office from other parcels). Walton County Ordinance No. 2000-03 was adopted and recorded in February of 2000.

In June of 2000, Intrawest Sandestin agreed to convey approximately 26.2 acres (described as Parcel 208A and Parcel 208B) to Baytowne Commercial Joint Venture Partners II (another entity controlled by Howard), and acknowledged "that under the currently approved Development Order, a total aggregate of 398,000 square feet of commercial retail intensity and an additional 40,000 square feet of

9

office use intensity is allocated to all of the Property, the Parcel 208A Property and the Parcel 208B Property, collectively."

On August 6, 2002, Intrawest Sandestin submitted an NOPC that again proposed transferring densities among parcels subject to the DRI order. The NOPC provided, in a footnote:

> The majority of Parcel 208/308 is currently undeveloped. The present densities as set forth in the existing and proposed changes applicable to Parcel 208/308 are and will be owned by the Howard Group, with the exception of the densities allocated to the nursing home, Tom Thumb Store, and Applebee's restaurant. The nursing home, Tom Thumb Store, and Applebee's restaurant are presently owned by non Howard Group entities and the square footages and uses are being established at the request of Walton County to accurately depict what was previously constructed or allocated under the prior DRI amendment. In addition, Tract 3 is unimproved and is not owned by Howard Group. All other improvements on Parcel 208/308 are presently owned by Howard Group.

This NOPC, approved by Walton County Ordinance No. 2002-18, increased the commercial square footage available for retail, banking, office and hotel development on Parcel 208/308.

During a hearing prior to the adoption of Ordinance No. 2002-18, counsel representing K & H requested assurance that Tract 3 was not included in the NOPC. Attorneys for Howard/Intrawest Sandestin represented that the NOPC would not affect development rights for Tract 3. A letter from Keith Howard to

10

Walton County staff, regarding the NOPC, "reconfirm[ed] that the proposed NOPC does not affect property within Sandestin that is not owned by Howard Group" and that "any non Howard Group property owner will not have their ownership status or development ability changed by this NOPC. Their present status will continue."

In 2008 when the Murray parties applied to Walton County for a development order for Tract 3, county personnel advised them it appeared that the Howard parties owned all development rights for Parcel 208,[12] in which Tract 3 lies. A "pre-application note" made by Walton County staff suggested that an "NOPC may be needed to transfer density, intensity to this site."

---

[12] The DRI order contains the following provision:

> Prior to making any internal, likekind transfer within the DRI, the proposed transfer, with the exception noted below, must first be approved by Sandestin. After Sandestin has approved of the transfer, a notice of the proposed transfer must be submitted in writing to the Walton County Planning and Zoning Department with an explanation of the proposed change. The Walton County Planning and Zoning Department shall review the proposed change and inform the applicant in writing within fifteen (15) days whether the proposed transfer is approved, denied, or requires additional information, and the reasons for the Department's decision. The Walton County Planning and Zoning Department shall approve the transfer if the type of use to be transferred is available for development and is being transferred to an area which has been previously approved for that type of use within the DRI. The approval of Sandestin shall not be required for any likekind transfers within Parcels 208/308 which are owned by the Howard Group. . . .

Present Judicial Proceedings Begin Below

On September 10, 2002, Howard filed suit in Walton County Circuit Court against Murray and K & H, alleging intentional interference with Howard's option contract, among other things. Howard asserted that, after Centaworld Holding gave the option on Tract 3, Murray induced Centaworld Holding to execute a second mortgage, which, as a practical matter, prevented Centaworld Holding from performing under the terms of the option: Howard alleged that, because the option price would not be enough to satisfy Murray's second mortgage, Centaworld could not convey clear title as required by the option contract. Howard asserted Murray further interfered tortiously by obtaining the first mortgage People's First held on Tract 3 and a quitclaim deed to Tract 3 from Centaworld, alleging specifically that Murray had knowledge of the option at the time Murray obtained the second mortgage and quitclaim deed.

Howard's suit remained pending when, in 2009, Murray parties (K & H and Bla-Lock) filed against Howard, Walton County, and Intrawest Sandestin, in the United States District Court for the Northern District of Florida. Murray's complaint stated federal and state law claims[13] alleging Murray was unable to

---

[13] Murray claimed: (i) tortious interference with a business relationship, conversion, and civil theft by Howard; (ii) equal protection and substantive due process violations under 42 U.S.C. § 1983 by all defendants; (iii) equitable estoppel and inverse condemnation against Walton County; and (iv) fraudulent misrepresentation on the part of Howard, Sandestin Corporation and Intrawest.

develop Tract 3 even though commercial development rights had been conveyed as a matter of law when Bla-Lock acquired title to Tract 3. Howard counterclaimed for declaratory judgment, asking the federal court to declare that K & H did not own development rights in Tract 3 or any other portion of Parcel 208/308. After entering summary judgment in favor of the defendants on claims alleging violation of the equal protection clause and a substantive due process violation, the federal court declined to exercise pendent jurisdiction over state law claims.[14]

The Murray parties then filed in state court, alleging (insofar as pertinent here) civil theft, tortious interference with a business relationship, and fraudulent and negligent misrepresentation by Howard; and inverse condemnation on the part of Walton County. Murray alleged that K & H had agreed in 2004 to sell Tract 3 to Parish National Bank for $1.65 million, but that the Bank cancelled the contract after Howard misrepresented to the Bank that Murray did not have development

---

[14] Howard maintains on appeal that three key factual findings by the federal court were binding and should not have been re-litigated below: (i) K & H initially obtained Tract 3 via a quitclaim deed that reflected no reservation or transfer of density or intensity; (ii) there is no other document through which K & H claims to have acquired commercial density/intensity and no document that specifically identifies any density/intensity rights being assigned to the parcel; and (iii) there is no record evidence that the Murray parties subsequently purchased density/intensity from the DRI developer. The order on appeal does not conflict with these three "key factual findings" of the federal district court. The trial court recognized that K & H received a quitclaim deed to the property and noted the federal court's opinion "merely confirm[ed] that no deed or other document of conveyance specifically mentioned a transfer of intensity rights from Sandestin to Murray or his predecessors in title."

rights for Tract 3. The complaint also alleged that "K & H has not been able to sell [Tract 3], despite several interested purchasers, due to the ongoing intentional interference of the Howard Defendants," and that Howard had falsely represented that the 2002 NOPC would impact only Howard-owned property on Parcel 208/308. Murray also contended that Walton County had effectively deprived K & H of its property rights in Tract 3 which, it said, constituted a de facto taking.

Murray's complaint sought declaratory relief and to "quiet title" to development rights, alleging that the conveyance to Great Southwest by Sandestin included 150,000 square feet of commercial development rights, and that the Murray parties retained their "proportionate share of the development rights through the chain of title." The trial court consolidated Murray's 2009 action with, among others,[15] the action Howard had initiated in 2002.

On February 4, 2013, the court ruled, on cross motions for summary judgment, that the Great Southwest contract (even read together with the

---

[15] Murray's response to the motion for consolidation identified two other cases:

> 4. In the 2006 case Plaintiffs K&H Development Group, Inc., Blalock Destin, Inc. and Roger Murray, Jr. have asserted claims against Defendants Howard Rock Fee, LLC and Sebring Zimbari, Inc., for slander of title and quiet title.
> 5. In the 2007 case Plaintiffs K&H Development Group, Inc. and Roger Murray have asserted claims against Defendants Sebring Zimbari and Keith Howard for trespass and for an injunction against Howard Rock Fee, LLC.

14

Supplemental Declaration to the CCR) did not transfer development rights, and noted that none of the deeds in the Murray parties' chain of title purported to convey development rights to Murray parties or to their immediate predecessor in interest. This ruling has not been directly challenged on appeal.

The order granting summary judgment also ruled against Howard on the 2002 complaint for damages and against Murray on the 2009 damages claims for tortious interference with a business relationship, fraudulent or negligent misrepresentation, or civil theft. The same order ruled inverse condemnation issues were not ripe for resolution because the application to develop Tract 3 Murray filed with Walton County was still pending. Finally, the summary judgment order ruled genuine issues of material fact remained with regard to whether or not all development rights in Parcel 208 had been transferred to the Howard parties, issues it decided against Howard in the final judgment. [16]

Development Rights Distinct From Legal Title

---

[16] Howard's claim was based on the Notices of Proposed Change approved by Walton County in Ordinance No. 2000-03 and Ordinance No. 2002-18 and the Intrawest Sandestin/Baytowne Real Estate Purchase Agreement. The trial court noted that Intrawest Sandestin did not own Murray's 1.453-acre parcel or the 16-acre tract from which it was taken at the time of the NOPCs and ordinances, the purchase agreement with Intrawest Sandestin "was not executed with the formalities required for the conveyance of real property or interests therein," and the Sandestin Master Plan in 1999 clearly indicated the Murray parcel was treated as a separate unit from Parcels 208A and 208B and was not included in the Intrawest purchase agreement.

To recapitulate, Tract 3 was part of a 16-acre parcel Sandestin Corporation conveyed in 1985. No document reflects an allocation or conveyance of development rights to Great Southwest or to the trustee who first received title to the parcel. The July 1985 deed to Mark E. Bentley, Trustee, conveying the fee estate, did not convey commercial square footage intensity for development. The deed's language granting legal title to the real property[17] made no mention of development rights.

In the absence of any agreement to convey specified development rights, no development rights were transferred when the 16-acre parcel "separated" from the 48.1-acre Parcel 208/308 (as the trial court itself acknowledged), much less when any Murray entity acquired Tract 3. There was no contract between any holder of development rights and the Murray interests, and Murray's only claim to development rights rests on naked title to the real estate. Bla-Lock acquired title to Tract 3 through mortgage foreclosure proceedings (after K & H had received a quitclaim deed making no mention of development rights). Obtaining title to real

_____

[17] The warranty deed from Sandestin Corporation to Mark E. Bentley, Trustee, stated: "Grantor does hereby fully warrant the title to the Property, and will defend same against the lawful claims of all persons whomsoever except taxes accruing after December 31, 1984 and covenants, restrictions, reservations and easements of record, including without limitation those matters described in the Supplemental Declaration to Sandestin Declaration of Covenants, Conditions and Restrictions dated July 1, 1985 and filed in the public records of Walton County, Florida under Clerk's File No. 340775, provided this mention shall not serve to reimpose same."

16

estate subject to a DRI order does not, however, in and of itself confer development rights.

As the trial court explained, "[b]y their nature, DRIs are designed to allow flexibility in the distribution of development rights within the development area. Rather than immediately creating small lots and assigning a certain amount of square footage for development to each, the property is divided into larger tracts with the intent that they later be subdivided by deeds into such smaller pieces as the market dictates. The intensity needed for individual development is then assigned to each smaller parcel as indicated, and county officials are notified, so that the assigned amount can be deducted to reflect on the county records the intensity remaining available for future development."

Development rights allocated to a parcel of DRI property need not be deployed uniformly over the entire parcel. When DRI property is subdivided, the contracting parties determine which development rights, if any, are transferred, unless the development order provides otherwise.[18] Development rights need not,

---

[18] The record on appeal contains numerous examples of documents, recorded in the Walton County official records, in which DRI developers conveyed development rights. See, e.g., Confirmation of Development Density, recorded July 12, 1983, O.R. Book 268, Page 542 (Sandestin Corporation granting the right to construct not more than 1,000 residential units upon Grantee's property, and providing the right to construct "certain residential units on the Property shall not be assignable by Grantee, except in connection with any sale or transfer of the fee simple interest"); Memorandum of Allocation, recorded December 20, 1985, O.R. Book 387, Page 224 (Sandestin Corporation, as developer, "allocates and affirms

17

indeed, attach to all land within a parcel to which aggregate development rights are assigned. Wetlands or other topographical issues may render part of a parcel undevelopable. A DRI developer may identify portions of DRI property for public parks, convey to a nature conservancy, or in other ways dispose of a subparcel without any intention that it be developed. And a nature conservancy or other

---

the necessary density for the construction of 177 residential dwelling units within the Beach Club Site"); Memorandum of Allocation, recorded March 13, 1987, O.R. Book 413, Page 752 (Sandestin Corporation, as developer, "allocates and affirms the necessary density for the construction of 582 residential dwelling units within the North Tip"); Agreement Regarding Development Order, recorded June 19, 2001, O.R. Book 2332, Page 1338 (Intrawest Sandestin Company, L.L.C., recites that it had by warranty deed contemporaneously conveyed 2.07 acres to Fisherman's Village One Development Company, L.L.C., and that it "consents and agrees that [Fisherman's Village] may construct on the Property not more than 10 residential units and not more than 45,735 square feet of commercial space") and "assigns and transfers . . . such development rights and entitlements under the Development Order as are necessary to develop the Property for the Permitted Uses").

In rejecting Murray's equal protection claim, the federal district court found the 1.453-acre parcel at issue "is not the only one with development issues. There are other parcels of property in the Sandestin DRI without density or intensity, including a parcel owned by the Howard Group for which they have unsuccessfully tried 'for quite some time' to obtain density or intensity. The Howard Group has also sold property within Parcels 208/308 without development rights, such that the purchaser had to obtain approval from the DRI Declarant to develop the property. The Howard Group itself also has purchased property and separately negotiated to purchase additional development rights on the property. Density/intensity did not necessarily run with the land, as Walton County public records reflect numerous documents showing that property owners purchased, reserved, obtained options to purchase or otherwise obtained rights to density/intensity from the DRI Developer within the Sandestin DRI." K & H Dev. Corp., Inc. v. Howard, 2009 WL 1034971, at *10 (N.D. Fla. 2009) (citations omitted).

18

grantee may purchase a subparcel for such purposes without acquiring development rights.[19]

In sum, we hold development rights do not pass automatically with the conveyance of the fee interest in a DRI subparcel. See Keith v. Mountain Resorts Dev., L.L.C., 337 P.3d 213, 227 (Utah 2014) ("Land development rights, which are a conditional right granted and controlled by the county government, are not included as a matter of law in a deed's general terms of conveyance giving a grantee the 'rights and privileges belonging' to a piece of real property."). There is no automatic transfer of a specific proportion (or even some reasonable portion) of the development rights allotted to a large parcel on a DRI master plan when a conveyance is made of title to only a portion of the large parcel.

Alleged Interference with Howard's Option Contract on Tract 3

On review of summary judgment, the court's "task is to determine whether, after reviewing every inference in favor of Appellants as the non-moving party, no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law." Dianne v. Wingate, 84 So. 3d 427, 429 (Fla. 1st DCA 2012). "If there is even the slightest doubt that material factual issues remain, summary

---

[19] This is not a case where the holder of development rights sold a fee interest in a portion of DRI property while withholding development rights known to be necessary for the purchaser's intended use, without discussing the matter with the purchaser. Such a case would inevitably raise issues of fraud in the inducement.

judgment may not be entered." Alpha Data Corp. v. HX5, L.L.C., 139 So. 3d 907, 910 (Fla. 1st DCA 2013).

Four elements are required to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference. See Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985); McKinney-Green, Inc. v. Davis, 606 So. 2d 393, 397-98 (Fla. 1st DCA 1992) (treating absence of justification as a separate element).

There is no dispute that Mr. Howard and Centaworld Holding entered into a contract giving Howard an option to purchase Tract 3. Material factual issues exist regarding the remaining elements.[20] Mr. Howard and his attorney testified on deposition that Mr. Gardner told them that when he assigned the second mortgage to Murray, Mr. Murray was well aware of the option agreement and Howard's

---

[20] "'A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law. . . . If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it.'" Feizi v. Dep't of Mgmt. Servs., State of Fla., 988 So. 2d 1192, 1193 (Fla. 1st DCA 2008) (quoting Moore v. Morris, 475 So. 2d 666, 668 (Fla. 1985)).

efforts to assemble all the property in Parcel 208/308.  See Progressive Express Ins. Co. v. Camillo, 80 So. 3d 394, 399 (Fla. 4th DCA 2012) ("A trial court may not weigh the evidence or judge the credibility of witnesses in arriving at summary judgment.").  Mr. Howard testified that Mr. Gardner,[21] who controlled Centaworld, told him that Mr. Murray promised to release the parcels encumbered by the second mortgage upon payment of the purchase prices set out in the option agreement.

Genuine issues of material fact exist regarding whether Murray knew about the option and intentionally interfered with the contract or Gardner's business relationship with Howard in a commercially unjustified manner.  Mr. Murray claims he was unaware of the option but also argues that he was entitled to advance or protect his own business or financial interests for any lawful reason or motive, using proper methods.  See McCurdy v. Collis, 508 So. 2d 380, 384 (Fla. 1st DCA 1987) ("The justification for intentional interference 'depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important.'" (citation omitted)).  But any determination whether a defendant acted

---

[21] Mr. Murray and Mr. Gardner acknowledged they were close friends; there was testimony that the two speak on the phone two or three times each month, have lunch together about twice a month, and exchange Christmas gifts.

without justification is also highly fact dependent and "requires an examination of the defendant's 'conduct, its motive, and the interests it sought to advance.'" Sec. Title Guarantee Corp. of Baltimore v. McDill Columbus Corp., 543 So. 2d 852, 855 (Fla. 2d DCA 1989) (citations omitted).  The trial court erred in granting the Murray parties' motion for summary judgment on Howard's tortious interference claims.

Alleged Taking and Interference with Murray's Contract to Sell Tract 3

We affirm entry of summary judgment on Murray's 2009 claims.  First, the trial court correctly determined the claims against Walton County for inverse condemnation were not ripe.  A claim "'is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'"  Alachua Land Investors, LLC v. City of Gainesville, 107 So. 3d 1154, 1158-59 (Fla. 1st DCA 2013) (quoting Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985)).  Although "extraordinary delay" may obviate the finality requirement, see Grosscup v. Pantano, 725 F. Supp. 2d 1370, 1379 (S.D. Fla. 2010), the record establishes the delay in this case can be attributed to Murray's failure to provide the County with needed additional information regarding matters other than the contested development rights.  See Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2001) (stating "that a taking may

22

occur by reason of 'extraordinary delay in governmental decisionmaking,'" but that "delay in the permitting process may be attributable to the applicant as well as the government." (citation omitted)).

Finally, Murray's argument that the trial court erred in granting summary judgment on its claims of tortious interference with a business relationship, fraudulent misrepresentation,[22] negligent misrepresentation,[23] and civil theft[24] all rely on Murray's claim to have had development rights for Tract 3 and Murray's claim that Howard's representations that title to Tract 3 did not automatically

---

[22] To prevail on an action for fraudulent misrepresentation, a plaintiff must establish: "(1) a false statement concerning a material fact; (2) the representer's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Specialty Marine & Indus. Supplies, Inc. v. Venus, 66 So. 3d 306, 310 (Fla. 1st DCA 2011).

[23] "To state a cause of action for negligent misrepresentation, a plaintiff must show: '(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.'" Id. at 309 (citation omitted).

[24] To prevail on an action for civil theft, the plaintiff must prove that the defendant (1) knowingly; (2) obtained or used, or endeavored to obtain or use, the plaintiff's property; (3) with felonious intent; (4) to deprive plaintiff of its right to or a benefit from the property or appropriate the property to the defendant's own use or to the use of a person not entitled to the use of the property. See Gersh v. Cofman, 769 So. 2d 407, 409 (Fla. 4th DCA 2000) ("[T]o establish an action for civil theft, the claimant must prove the statutory elements of theft, as well as criminal intent."); § 812.014(1), Fla. Stat. (2002).

confer development rights under the DRI order were false. As explained above, Howard's assertions in this regard were not false or actionable.

Affirmed in part, reversed in part, and remanded for further proceedings.

WOLF and RAY, JJ., CONCUR.