JAMES S. MOODY, JR., UNITED STATES DISTRICT JUDGE
THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss (Dkt. 36), Plaintiff's Response in Opposition (Dkt. 42), Defendants' Memorandum in Support of the Motion (Dkt. 48), and Plaintiff's Response to Defendants' Memorandum (Dkt. 55). The Court, having reviewed the filings and being otherwise advised in the premises, concludes that Defendants' Motion should be granted in part.
BACKGROUND
The 340B Drug Pricing Program ("340B Program" or "340B") is a federal government program that allows qualifying healthcare providers, called "covered entities," to purchase outpatient drugs at a *1347 significant discount. After purchasing the discounted drugs, covered entities can dispense them to patients directly, or through third-party pharmacies called "contract pharmacies." The 340B Program provides covered entities with savings based on the discounted prices of drugs. And participants in the program can choose how to use the savings they realize, including "caring for more patients, providing charitable medical care, and offsetting losses incurred from treating underinsured, uninsured, and indigent patients." Dkt. 30, p. 5.
The 340B Program holds participating covered entities responsible for complex tasks such as managing the contract pharmacies, preventing duplicate discounts for certain drugs, and ensuring compliance with government regulations. Plaintiff RxStrategies, Inc. ("RxStrategies") is a 340B program administrator, hired by covered entities to ensure their compliance with the 340B Program. Defendant CVS Pharmacy, Inc. ("CVS") is a retail pharmacy chain with some (or as RxStrategies argues, many) contract pharmacies that dispense outpatient drugs pursuant to the 340B Program.
According to RxStrategies, in 2016, CVS approached RxStrategies with the idea that RxStrategies could serve as a program administrator for CVS. The two entities entered into a mutual non-disclosure agreement ("NDA"), and RxStrategies began designing, building, and testing software solutions for CVS. RxStrategies alleged it shared proprietary information with CVS during these development phases, including lists of RxStrategies' covered entity customers and data processing solutions.
On December 18, 2017, CVS announced it acquired Defendant Wellpartner, LLC ("Wellpartner") to serve as CVS's exclusive program administrator for the 340B Program. RxStrategies alleged that CVS shared RxStrategies' proprietary information with Wellpartner, and Wellpartner contacted some of RxStrategies' covered entity customers. Wellpartner and RxStrategies are direct competitors.
CVS now requires any covered entity that wants to fill 340B Program prescriptions at a CVS pharmacy to use Wellpartner as its program administrator. If the covered entity does not want to use Wellpartner as its 340B program administrator, it cannot utilize CVS as a contract pharmacy for the 340B Program.
RxStrategies filed suit against CVS and Wellpartner alleging claims for illegal tying in violation of the Sherman Act against both Defendants (Count I); breach of contract against CVS (Count II); tortious interference with a contractual relationship against both Defendants (Count III); tortious interference with a business relationship against both Defendants (Count IV); misappropriation of trade secrets against both Defendants (Counts V and VI); fraud in the inducement against CVS (Count VII); fraudulent misrepresentation against CVS (Count VIII); negligent misrepresentation against CVS (Count IX); and unjust enrichment against CVS (Count X). Defendants move to dismiss RxStrategies' Amended Complaint.
MOTION TO DISMISS STANDARD
Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint when it fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss, a court must accept all factual allegations in the complaint as true. Erickson v. Pardus , 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (internal citation omitted). It must also construe those factual allegations in the light most favorable to the plaintiff. Hunt v. Aimco Properties, L.P. , 814 F.3d 1213, 1221 (11th Cir. 2016) (internal citation omitted).
*1348 To withstand a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Pleadings that offer only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action," will not do. Twombly, 550 U.S. at 555, 127 S.Ct. 1955.
DISCUSSION
Count I: Tying in Violation of the Sherman Act, 15 U.S.C. § 1, against both Defendants
As an initial matter, the Court notes that RxStrategies is required to establish antitrust standing to assert its antitrust claim. See Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp. , 604 F.3d 1291, 1298 (11th Cir. 2010) ("courts require parties to show that they are the proper plaintiffs to vindicate the public's interest in enforcing the antitrust laws.") "Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." Todorov v. DCH Healthcare Auth. , 921 F.2d 1438, 1448 (11th Cir. 1991). The Eleventh Circuit has established a two-prong test for antitrust standing: "(1) the plaintiff must establish that it has suffered an antitrust injury, and (2) the plaintiff must be an 'efficient enforcer' of the antitrust laws." Sunbeam Television Corp. v. Nielsen Media Research, Inc. , 711 F.3d 1264, 1271 (11th Cir. 2013) (internal citations omitted). Neither party disputes RxStrategies' antitrust standing, and the Court concludes that RxStrategies has established standing to bring its antitrust claim.
With its antitrust claim, RxStrategies takes issue with CVS's mandate: covered entities that want to use CVS for 340B contract pharmacy services must also use Wellpartner for 340B program administrator services. RxStrategies alleges that Defendants violate the Sherman Act by tying these two services.
To bring a claim under section one of the Sherman Act, RxStrategies "must define the relevant market and establish that the defendants possessed power in that market." Duty Free Americas, Inc. v. Estee Lauder Companies, Inc. , 797 F.3d 1248, 1263 (11th Cir. 2015) (citation omitted). See also Jacobs v. Tempur-Pedic Intern., Inc. , 626 F.3d 1327, 1336 (11th Cir. 2010). The relevant market includes the geographic market and the product market. Id. Defendants argue the Court should dismiss RxStrategies' claim because RxStrategies fails to establish the geographic market and the requisite market power. The Court discusses each element below.
Geographic Market
The relevant geographic market is "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." Duty Free Americas , 797 F.3d at 1263 (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc. , 735 F.2d 414, 423 (11th Cir.1984) ). It is "comprised of the area where [ ] customers would look to buy [ ] a product." Tunis Bros. Co., Inc. v. Ford Motor Co. , 952 F.2d 715, 726 (3d Cir. 1991). When determining a geographic market, a court must consider "economic and physical barriers to expansion [such] as transportation costs, delivery limitations and customer convenience and preference."
*1349 Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc. , 101 F. Supp. 3d 1319, 1336 (N.D. Ga. 2015). And markets that involve services offered only at a particular location "like those provided by hospitals [and] theaters ... will often be defined by how far consumers are willing to travel." Id. (citing Earl W. Kintner, Federal Antitrust Law § 10.15 (2013)).
RxStrategies alleges the relevant geographic market in this case "consists of local relevant geographic markets across the country ... limited to the distance that a covered entity's patients travel to fill their prescriptions." Dkt. 30, p. 35. RxStrategies supports this allegation with facts including a covered entity's strong preference for utilizing contract pharmacies located close to the entity's patients and ways in which covered entities compete with one another. RxStrategies notes the "area of competition is typically small" based on patients' travel preferences. Id. at p. 35.
Defendants argue that "local" markets are not proper geographic markets and that RxStrategies does not provide the specific size or boundary of any local market. Defendants cite to Spanish Broadcast System of Fla., Inc. v. Clear Channel Communications, Inc. , where the Eleventh Circuit described a relevant geographic market as "a distinct market, with a specific set of geographical boundaries." 376 F.3d 1065, 1074 (11th Cir. 2004). But this description was not made in the context of pleading requirements. See Thompson v. Metro. Multi-List, Inc. , 934 F.2d 1566, 1573 (11th Cir. 1991) ("The parameters of a given market are questions of fact."). Six years later, the Eleventh Circuit decided Jacobs v. Tempur-Pedic Intern., Inc. , and declared that to survive a motion to dismiss, "antitrust plaintiffs ... must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." 626 F.3d at 1336. RxStrategies' allegations, taken together, "plausibly suggest the contours" of the relevant geographic market.
Market Power
Market power exists when a "seller has some special ability ... to force a purchaser to do something that he would not do in a competitive market." Illinois Tool Works Inc. v. Indep. Ink, Inc. , 547 U.S. 28, 36, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006) (citing Jefferson Par. Hosp. Dist. No. 2 v. Hyde , 466 U.S. 2, 13, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated by Illinois Tool Works , 547 U.S. 28, 126 S.Ct. 1281 ). In the context of antitrust claims, "sufficient economic power in the tying product market," enables a seller to "coerce buyer acceptance of the tied product." Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia , 815 F.2d 1407, 1414 (11th Cir. 1987), holding modified by Thompson v. Metro. Multi-List, Inc. , 934 F.2d 1566 (11th Cir. 1991).
"[In] all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Illinois Tool Works, 547 U.S. at 46, 126 S.Ct. 1281. "[A] showing of market power is necessary, but not sufficient, to establish potential harm to competition." Jacobs , 626 F.3d at 1340 (internal citation omitted). It is "unmistakably clear" that a seller's "economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market." Fortner Enterprises, Inc. v. U.S. Steel Corp. , 394 U.S. 495, 502-03, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." Id.
*1350 "Relevant determinants of the market power of a prospective predator ... include its absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment." U.S. Anchor Mfg., Inc. v. Rule Indus., Inc. , 7 F.3d 986, 994 (11th Cir. 1993), certified question answered , 264 Ga. 295, 443 S.E.2d 833 (1994) (citing International Tel. & Tel. Corp. , 104 F.T.C. 280, 412 (1984) ). Overall, "the principal judicial device for measuring actual or potential market power remains market share, typically measured in terms of a percentage of total market sales." Id.
Defendants argue that RxStrategies alleges information about CVS's dominance among retail pharmacies, not 340B contract pharmacies. Therefore, Defendants argue, RxStrategies does not allege market power in the relevant market. Defendants also argue that RxStrategies does not allege enough for the Court to infer that CVS's retail pharmacy market power (a market share of 23.6% of retail pharmacies) is sufficient to establish market power for 340B contract pharmacies. The Court addresses each argument.
RxStrategies alleges many facts about CVS. According to RxStrategies, 82% of the population lives within 10 miles of a CVS pharmacy location; CVS is the second-largest contract pharmacy; CVS has grown its number of locations by 281% since 2013, and has 9,800 pharmacy locations ("the most pharmacy locations"); patients fill their prescriptions, including prescriptions pursuant to the 340B Program, close to where they live; covered entities utilize pharmacies that a large percentage of their patients already use to fill prescriptions; and covered entities view CVS as an "essential" contract pharmacy. RxStrategies also urges the Court to accept that available data about CVS's market share in the 340B contract pharmacy market is understated because of CVS's recent changes to its policies for partnering with covered entities.[1]
In a way, RxStrategies asks the Court to infer that CVS's dominance among retail pharmacies results in dominance in the 340B contract pharmacy market. Though this may be true, RxStrategies' Amended Complaint does not include enough for the Court to infer the level of dominance that equates to market power in the relevant product market. Importantly, as Defendants argue, RxStrategies alleges much about CVS's national market power and market share in certain states. But RxStrategies alleged its geographic markets are local. The allegations are not inconsistent, but they are lacking for the geographic market RxStrategies defined.
The parties argue over the importance of CVS's alleged 23.6% nationwide market share of retail pharmacies. Though the number would likely be insufficient to establish market power, the figure is for a different product market, so it does not have as much relevance here. With 23.6% of the retail pharmacy market share, CVS could have a 10% market share of 340B contract pharmacies or a 90% share. RxStrategies alleges that the five largest pharmacy chains (as alleged, "CVS, Walgreens, Walmart, Rite Aid, and Kroger") represent 60% of 340B contract pharmacies.
*1351 Dkt. 30, p. 12. It is unclear what percentage of this share CVS occupies.
RxStrategies does allege that CVS has a 60% market share for specialty drugs in the 340B Program. But RxStrategies does not allege how this figure translates to the 340B drug market as a whole, and importantly, CVS's share of the market.[2]
RxStrategies also alleges that "nearly 8,000 covered entities participate" in the 340B Program. Dkt. 30, p. 4. And since CVS's partnership with Wellpartner, 1,200 covered entities that previously used only RxStrategies as their 340B program administrator now use only Wellpartner. These figures, among others, help explain the alleged effects CVS's decision has had on some of the contract pharmacy market. But they are not enough to establish market power in the relevant market, especially when RxStrategies' geographic markets are local markets.
Though the Amended Complaint paints the picture of CVS's dominance in the retail pharmacy market, the facts do not establish the requisite market power. Accordingly, the Court will dismiss the claim, without prejudice.
Counts V and VI; Misappropriation of Trade Secrets, against both Defendants
A misappropriation claim requires a showing that "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." Audiology Distribution, LLC v. Simmons , 812CV02427JDWAEP, 2014 WL 12620835, at *1 (M.D. Fla. Jan. 8, 2014). RxStrategies brings two misappropriation claims: one under the Defend Trade Secrets Act ("DTSA"), codified at 18 U.S.C. 1836, and the other under the Florida's Uniform Trade Secrets Act ("FUTSA"), codified at Chapter 688 of Florida Statutes.
The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was ... acquired under circumstances, which gives rise to a duty to maintain the secrecy or limit the use of the trade secret." Temurian v. Piccolo , 18-CV-62737, 2019 WL 1763022, at *10 (S.D. Fla. Apr. 22, 2019) (citing 18 U.S.C. § 1839(5) ). The FUTSA provides an identical definition.
The DTSA defines a "trade secret" as
all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
(A) the owner thereof has taken reasonable measures to keep such information secret; and
(B) the information derives independent economic value, actual or *1352 potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information
18 U.S.C. § 1839. RxStrategies alleged Defendants misappropriated trade secrets, in the form of proprietary customer information and data processing solutions. Defendants argue that neither constitutes a trade secret and that RxStrategies failed to establish Defendants misappropriated the information. The Court discusses each category of information below.
Customer Information
Defendants first argue RxStrategies' customer information is not a trade secret because the information, such as a covered entity's "authorizing official and primary contact," is publicly available on a government website. Dkt. 36, p. 23. RxStrategies argues that each covered entity's 340B program administrator is not available on the website. As presented, the issue is a factual dispute, not a legal one.
Defendants also argue that RxStrategies' customers' "needs and goals" are too broad to be considered trade secrets. But RxStrategies alleged sufficient facts to establish, at this stage, that it expended effort to compile this information and transform it into a trade secret. For example, RxStrategies alleged it "devote[d] substantial resources and investment ... to prospecting, identifying, and developing covered entities interested in participating in the 340B program.... [and] deploy[ed] its professionals to study a covered entity and the patient community it serves in order to understand the covered entity's needs and goals for participation in the 340B program, and to develop meaningful relationships with various individuals within the covered entity." Dkt. 30, p. 20. See SMS Audio, LLC v. Belson , 9:16-CV-81308, 2016 WL 8739764, at *3 (S.D. Fla. Aug. 16, 2016) ("Customer lists can constitute trade secrets where the lists are acquired or compiled through the industry of the owner of the lists and are not just a compilation of information commonly available to the public."). RxStrategies also alleged it took protective measures to prevent disclosure of the information including "restricting access to authorized users only via password-protected portals." Id. The Court concludes RxStrategies alleged sufficient facts to establish its customer lists are trade secrets.
Defendants also argue RxStrategies failed to allege any facts showing Defendants misappropriated any of the information. RxStrategies responded to Defendants' argument with caselaw the Court finds persuasive. And to allege misappropriation, RxStrategies alleged facts about its reliance on its NDA with CVS, among other things. At this stage, RxStrategies has alleged sufficient facts to support its claim.
Data Processing Solutions
Defendants also argue that RxStrategies failed to show its "proprietary data processing solutions" are trade secrets. As alleged, however, RxStrategies does more than allege "the existence of general categories of 'confidential information.' " Elsevier Inc. v. Doctor Evidence, LLC , 17-CV-5540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y. Jan. 23, 2018). RxStrategies alleged that its data processing solution, "identifies and segregates eligible 340B prescription activity by an eligible covered entity's patients at the pharmacy level," and enables a drug's replenishment through a covered entity's 340B Program account, instead of other accounts. Dkt. 30, p. 22-23. The solutions included "reporting *1353 and tracking mechanisms" to comply with the 340B program. Id. Based on RxStrategies' allegations of the complexities of compliance with the 340B Program and its efforts to create software solutions for such compliance, the allegations are sufficient to establish that the processing solutions are trade secrets.
Defendants again argue RxStrategies failed to allege enough to support any misappropriation of the processing solutions. Defendants focus on one of RxStrategies' allegations and deem it insufficient: Wellpartner transitioned customers from RxStrategies to Wellpartner at a quicker rate than it would have been able to absent information from RxStrategies' data processing solutions. But RxStrategies alleged other facts to indicate that Defendants disclosed or used RxStrategies' data processing solutions. Among them, RxStrategies alleges that CVS would not have been able to eliminate its one-to-one policy without RxStrategies' processing solutions. The alleged facts taken together plausibly establish misappropriation of the data processing solutions to survive a motion to dismiss.
Count II, Breach of Contract, against CVS
Defendants urge dismissal of RxStrategies' breach of contract claim for the same reasons Defendants argued the misappropriation claims should be dismissed. Because the Court rejected the arguments, the breach of contract claim remains.
Further, RxStrategies alleged that CVS and RxStrategies entered into an NDA, CVS breached the NDA, and RxStrategies suffered damages as a result of the alleged breach. With these allegations, RxStrategies plausibly alleged a breach of contract claim.
Counts III and IV, Tortious Interference with a Contractual Relationship and Tortious Interference with a Business Relationship, against both Defendants
A plaintiff must prove four elements to establish tortious interference with a contractual or business relationship: "(1) the existence of a business relationship or contract; (2) knowledge of the business relationship or contract on the part of the defendant; (3) an intentional and unjustified interference with the business relationship or procurement of the contract's breach; and (4) damage to the plaintiff as a result of the interference." Howard v. Murray , 184 So. 3d 1155, 1166 (Fla. Dist. Ct. App. 2015).
RxStrategies alleged all four elements for each of its tortious interference claims. But Defendants argue that RxStrategies' claims fail because they are based on a failed antitrust claim and are otherwise preempted by FUTSA.
As to Defendants' preemption argument, FUTSA "displace[s] conflicting tort, restitutory, and other law[s] of [the state of Florida] providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008(1). But it does not affect "[o]ther civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Courts in this Circuit have concluded that "to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim." PB Legacy, Inc v. Am. Mariculture, Inc. , 2:17-CV-9-FTM-29CM, 2018 WL 6325315, at *2 (M.D. Fla. Dec. 4, 2018) (citing New Lenox Indus., Inc. v. Fenton , 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007) ) (citation omitted). "Thus, the issue becomes whether allegations of trade secret *1354 misappropriation alone comprise the underlying wrong; if so, the cause of action is preempted by the FUTSA." Id. (quotation and citation omitted).
RxStrategies' tortious interference claims do not consist only of allegations of misappropriation. For example, RxStrategies alleged CVS interfered with RxStrategies' contracts and business relationships by forcing customers to use Wellpartner as their exclusive 340B program administrator. The Court concludes that RxStrategies' tortious interference claims are not preempted by FUTSA. And because neither tortious interference claim depends on the success of RxStrategies' antitrust claim, the claims withstand Defendants' Motion to Dismiss.
Counts VII, VIII, IX, Fraud in the Inducement, Fraudulent Misrepresentation, and Negligent Misrepresentation, against CVS
Claims for fraudulent misrepresentation and fraudulent inducement require a showing of: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Moriber v. Dreiling , 194 So. 3d 369, 373 (Fla. Dist. Ct. App. 2016). And "to establish negligent misrepresentation, a party is required to prove: (1) a misrepresentation of material fact that the defendant believed to be true but which was in fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc. , 232 So. 3d 502, 505 (Fla. Dist. Ct. App. 2017).
RxStrategies "must state with particularity the circumstances constituting [the] fraud or mistake" for these three claims. Fed. R. Civ. P. 9. This requires RxStrategies to allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Smiley v. Nationstar Mortgage LLC , 202 F. Supp. 3d 1322, 1324 (M.D. Fla. 2016) (citing Garfield v. NDC Health Corp. , 466 F.3d 1255, 1262 (11th Cir. 2006) ) (citation omitted).
Defendants argue these three claims should be dismissed because the claims are preempted by FUTSA. Defendants also argue RxStrategies did not comply with Rule 9(b)'s particularity requirement and RxStrategies failed to allege that Defendants intended to deceive RxStrategies. The Court will discuss RxStrategies' claims for fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation together because Defendants' arguments for dismissal apply to each claim equally.
First, because these claims do not consist only of allegations relating to Defendants' alleged misappropriation of trade secrets, they are not preempted by FUTSA.
Second, in support of its claims, RxStrategies alleged that Christian Reid ("Reid"), the Senior Director of the 340B Program for CVS, and Jaclyn Baptista ("Baptista"), the "Senior Implementation Manager, Health System Alliances, for *1355 CVS," falsely assured several RxStrategies' representatives (whom RxStrategies lists) that RxStrategies' software was going live soon but had technical issues. Dkt. 30, p. 46. These individuals also allegedly made representations that "a timeline for going live was pending." Id. RxStrategies alleges Reid and Baptista made these representations over the course of a few months, and specifically via email on July 5, 2017. These allegations meet Rule 9(b)'s pleading requirements.
And finally, RxStrategies alleged that Reid and Baptista, on behalf of CVS, "intended to induce RxStrategies to rely and act on the misrepresentations." Dkt. 30, p. 47, 49, 51. This satisfies the requirement that RxStrategies plead "intent" for each of the three claims. To the extent Defendants argue RxStrategies' allegations of intent lack detail, Rule 9 specifically permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9. Accordingly, the Court will not dismiss RxStrategies' claims for fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation.
Count X Unjust Enrichment, against CVS
"A claim for unjust enrichment is an equitable claim, based on a legal fiction created by courts to imply a 'contract' as a matter of law." Tooltrend, Inc. v. CMT Utensili, SRL , 198 F.3d 802, 805 (11th Cir. 1999) (citing Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co., 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997) (en banc)). "[T]he law will, in essence, 'create' an agreement in situations where it is deemed unjust for one party to have received a benefit without having to pay compensation for it." Id.
The elements of a claim for unjust enrichment are: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012) (citing Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n. 4 (Fla. 2004) ).
RxStrategies alleged each element required for the cause of action. But CVS argues RxStrategies' claim is preempted by FUTSA. The Court agrees that the alleged benefits RxStrategies conferred to CVS mimic the proprietary information and trade secrets found in RxStrategies' misappropriation claims. See PB Legacy , 2:17-CV-9-FTM-29CM, 2018 WL 6325315, at *2. So, the unjust enrichment claim would ordinarily be preempted. But if no trade secrets exist, the claim would be proper. RxStrategies can therefore maintain its unjust enrichment claim for now, in the alternative.
CVS also argues it entered into a mutual NDA with RxStrategies, and the NDA governs the use (and misuse) of confidential information RxStrategies references in its unjust enrichment claim. The Court recognizes that "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." Diamond "S" Dev. Corp. v. Mercantile Bank , 989 So. 2d 696, 697 (Fla. Dist. App. Ct. 2008). But this Court has allowed a claim for unjust enrichment to be pled in the alternative to a breach of contract claim. See Bruggemann v. Amacore Group, Inc. , 8:09-CV-2562-T-30MAM, 2010 WL 2696230, at *5 (M.D. Fla. July 6, 2010) (Moody, J.) ("although Defendants are correct that a plaintiff cannot recover under both unjust enrichment and breach of contract, both the Federal Rules of Civil Procedure and Florida law *1356 permit a party to allege these claims in the alternative."). RxStrategies even argues that the "thrust of the claim-RxStrategies' uncompensated time and expense in developing the software solution for CVS-has nothing to do with confidential information and is not covered by the [NDA]." Dkt. 42, p. 20. Accordingly, the Court will allow the claim to remain.
Upon review and consideration, it is therefore
ORDERED AND ADJUDGED that:
1. Defendants' Motion (Dkt. 36) is GRANTED in part, as described herein.
2. Plaintiff's Count I is dismissed without prejudice.
3. Plaintiff may file an amended complaint within twenty-one (21) days from the date of this Order.
DONE and ORDERED in Tampa, Florida, this 29th day of March, 2018.

According to RxStrategies, before acquiring Wellpartner, CVS had a "one-to-one" policy where one CVS pharmacy location would serve as a contract pharmacy to only one covered entity. RxStrategies alleges this policy protected CVS from potential 340B Program compliance violations. Dkt. 30, p. 17. Today, CVS allows each of its pharmacies to contract with more than one covered entity for the 340B Program.

RxStrategies does allege that "[i]n 2016, CVS received $32 billion from specialty drugs, or 28% of all specialty drug prescription revenues." Dkt. 30, p. 15. But this fact does not allow the Court to glean CVS's market power in the relevant, 340B contract pharmacy market.