# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2021-3898

_____

SAMUEL A. OSBORNE,

    Appellant,

    v.

WALTON COUNTY, FLORIDA, a
political subdivision of the State
of Florida, and SANDESTIN
INVESTMENTS, LLC,

    Appellees.

_____

On appeal from the Circuit Court for Walton County.
Jeffrey E. Lewis, Judge.

February 12, 2025

PER CURIAM.

This case involves the Development Order ("DO") for the Sandestin Development of Regional Impact ("the Sandestin DRI").[1] More specifically, it involves the enactment of Revised

---

[1] Located in Walton County, Florida, the Sandestin DRI is a Development of Regional Impact organized under Chapter 380, Florida Statutes. As previously noted by the State of Florida Land and Water Adjudicatory Commission ("FLWAC"), and as detailed by Judge Winokur in his concurring opinion, the Sandestin DRI DO has a "complex history" that dates back to 1976.

Ordinance 2017-12, the mechanism by which Walton County approved a Notice of Proposed Change ("NOPC") filed by Sandestin Investments, LLC ("SDI").[2] SDI submitted the NOPC in response to a Determination of Non-Compliance ("DONC") issued by the County. Acting in its quasi-judicial capacity, the County approved SDI's NOPC, rescinded the DONC, and amended the Sandestin DRI DO.

After these actions by the County, Appellant Samuel Osborne[3] filed an action in circuit court, challenging the process by which the County amended the DRI DO. In his response to a motion for summary judgment, Osborne accurately described the parties' dispute: "[Osborne] contends that the proposed DRI changes . . . have not been validly adopted; [SDI] argues that they have." The validity of that adoption hinges on whether, before it considered Revised Ordinance 2017-12, the County should have complied with the special public notice requirements applicable to development agreements and DRI's.

After the County enacted Revised Ordinance 2017-12, Osborne claimed that, before considering SDI's NOPC, the County failed to comply with the special public notice requirements under section 163.3225, Florida Statutes, section 380.06, Florida Statutes, the Walton County Land Development Code, and "Florida law." Pertinent to this appeal, the section 163.3225 requirements apply when a local government considers entering into or modifying a development agreement; and, the section 380.06 requirements apply when a local government considers issuing or modifying a DRI DO.

SDI moved for summary judgment, arguing that development agreements have nothing to do with DRI DOs. Rather than addressing the special public notice requirements identified by Osborne, SDI argued that the County did not need to comply with the general public notice requirements under section 125.66, Florida Statutes. According to SDI, Revised Ordinance 2017-12 did

---

[2] SDI owns some of the development rights within the DRI.

[3] Osborne owns a home in a developed portion of the DRI.

not substantially or materially alter Ordinance 2017-12. Thus, no new round of public notifications was required.

Osborne responded, characterizing SDI's assertion as "a classic 'straw man' argument" because Osborne never claimed the County failed to comply with section 125.66, Florida Statutes. Osborne filed a cross-motion for summary judgment, claiming that a 1984 development agreement between a previous developer and the state land planning agency, as adopted by the County through the enactment of Ordinance 89-9, serves as the "benchmark" for all changes to the Sandestin DRI DO. According to Osborne, Ordinance 89-9 incorporated the 1984 development agreement into the Sandestin DRI DO. Therefore, any modification of the DO necessarily qualifies as a modification of a development agreement—thereby triggering the special public notice requirements under section 163.3225, Florida Statutes.

The trial court granted SDI's motion for summary judgment and denied Osborne's cross-motion for summary judgment. The trial court did not address Osborne's claim that, before considering Revised Ordinance 2017-12, the County failed to comply with the special public notice requirements applicable to development agreements and DRI DOs. Instead, the trial court agreed with SDI that section 125.66, Florida Statutes, did not require the County to send a new round of notifications before it considered Revised Ordinance 2017-12. The trial court found that such notifications were not required because Revised Ordinance 2017-12 did not substantially and materially change Ordinance 2017-12. We reject that finding. By the parties' own admissions, Revised Ordinance 2017-12 did something that Ordinance 2017-12 did not: it settled a lawsuit between the Sandestin Owners' Association ("SOA"), the County, and SDI.[4] Therefore, we reverse the final summary

---

[4] The DRI includes "a number of condominium and homeowner associations which govern individual condominium units and single-family residences." *Scott v. Sandestin Corp.*, 491 So. 2d 334, 334 (Fla. 1st DCA 1986). SOA "is a 'master association' comprised of representatives of these individual associations." *Id.* Formed in 1979, the SOA "is responsible for maintenance of roadways, lakes and lagoons, landscaping and lighting, security,

judgment and remand for the trial court to address Osborne's cross-motion for summary judgment.

I

On July 8, 2014, the County issued a DONC to SDI. The County found that SDI's noncompliance with open space requirements created regional impacts that had not been addressed.

In response to the DONC, SDI submitted a NOPC in 2016 under section 380.06, Florida Statutes. But SDI did not provide more open space acreage to address the deficiency identified in the DONC. Instead, SDI sought to bring its activities back into compliance with the Sandestin DRI DO by redefining what constitutes open space. In other words, rather than complying with the existing standard, SDI sought to change the standard.

SDI submitted the NOPC Application concurrently to the Florida Department of Economic Opportunity ("DEO") and the West Florida Regional Planning Council ("WFRPC"). Neither DEO (the state land planning agency at the time) nor WFRPC objected. *See* § 380.06(19)(e)1., Fla. Stat. (2017).

On January 19, 2017, and January 26, 2017, a Notice of Public Hearing appeared in the Defuniak Springs Herald & Breeze. Both notices announced an upcoming meeting of the Walton County Board of County Commissioners ("BOCC") for January 30, 2017. Under the heading "QUASI-JUDICIAL ITEMS," the notices listed the Sandestin DRI NOPC. As to the purpose of the public hearing, the notices stated: "Sandestin Investments, LLC, is requesting a determination that their application for a Notice of a Proposed Change (NOPC) to the previously approved Sandestin Development of Regional Impact (DRI) constitutes a non-substantial deviation under subsection 380.06(19), Florida Statutes."

---

garbage service, pest control, insurance and taxes for the entire project." *Id.*

4

On January 30, 2017, the County held a public meeting and considered SDI's NOPC. At the suggestion of the Walton County Attorney, the BOCC bifurcated the application and heard the portion dealing with the open space requirements first. After more than six hours of testimony and deliberation, a motion to approve the NOPC failed. Rather than deny the NOPC outright, the Walton County Attorney suggested that the BOCC entertain a motion to continue the meeting to a date certain. The motion was made and approved.

On March 2, 2017, and March 9, 2017, a Notice of Public Hearing appeared in the Defuniak Springs Herald & Breeze. Both notices announced an upcoming meeting of the BOCC for March 13, 2017. Under the heading "QUASI-JUDICIAL ITEMS," the notices listed the Sandestin DRI NOPC. As with the January 19, 2017, and January 26, 2017, notices, the March 2, 2017, and March 9, 2017, notices stated: "Sandestin Investments, LLC, is requesting a determination that their application for a Notice of Proposed Change (NOPC) to the previously approved Sandestin Development of Regional Impact (DRI) constitutes a non-substantial deviation under subsection 380.06(19), Florida Statutes."

On March 13, 2017, the BOCC reconvened and approved SDI's NOPC subject to certain conditions. The BOCC found that the NOPC included no substantial deviations to the Sandestin DRI DO. The BOCC rescinded the DONC.

On April 11, 2017, the County adopted Ordinance 2017-12, which approved SDI's NOPC and amended the Sandestin DRI DO by changing the applicable definition of open space. The County identified two types of proposed changes: "E1 Amendments" and "F3 Amendments." The term "E1" refers to changes subject to the review requirements of subparagraph (e)1 of section 380.06(19), Florida Statutes (2017); the term "F3" refers to changes that could trigger the public hearing requirements of subparagraph (f)3 of section 380.06(19). The BOCC found that both the "E1 Amendments" and the "F3 Amendments" in the NOPC "are non-substantial deviations" under section 380.06(19), Florida Statutes.

5

On April 20, 2017, SOA petitioned for administrative review with FLWAC, challenging the County's adoption of Ordinance 2017-12 ("the administrative appeal"). *See* § 380.07(2), Fla. Stat. (2017). SOA alleged that the "Amended Development Order was approved as a non-substantial deviation without further review, despite containing changes that qualify as substantial deviations . . . ." SOA's petition suspended rendition of Ordinance 2017-12. *See* § 380.07(4), Fla. Stat. (2017) ("The filing of the petition stays the effectiveness of the order until after the completion of the appeal process."). SDI then intervened in the administrative appeal and moved to dismiss SOA's Petition. The County filed a notice of joinder as to that motion.

On May 9, 2017, SOA sued in circuit court, alleging that the amended Sandestin DRI DO violates section 163.3215, Florida Statutes. SOA alleged that the terms of the DO were inconsistent with the Walton County Comprehensive Plan ("the comp plan challenge."). The circuit court held the action in abeyance pending the outcome of the administrative appeal.

During the fall 2017, SOA and SDI entered into a settlement agreement to resolve both the administrative appeal and the action in circuit court. On September 29, 2017, SDI and SOA agreed to the entry of a Stipulated Order in the circuit court. The Stipulated Order states: "[SDI] will ask Walton County to properly notice a public hearing for the [BOCC] to consider a settlement of this action by adopting the amended version of Walton County Ordinance 2017-12, attached hereto as . . . 'Amended DRI DO.'"

On October 10, 2017, at a regularly noticed meeting, the BOCC agreed to consider the settlement agreement between SOA and SDI as well as Revised Ordinance 2017-12 at its upcoming meeting on November 7, 2017.

On October 26, 2017, and November 2, 2017, a Notice of Public Hearing appeared in the Defuniak Springs Herald & Breeze. Signage was also posted within the DRI. The notices announced an upcoming meeting of the BOCC for November 7, 2017. The notices listed "QUASI-JUDICIAL ITEMS" to include "Sandestin DRI 380.06(19)(e)1 Change – Sandestin Investments, LLC is requesting to amend Ordinance 2017-12 to a previously approved

6

Development of Regional Impact (DRI), Section 380.06(19), Florida Statutes." The notices also stated: "*The purpose of the hearing is to consider settlement of the pending lawsuit* styled Sandestin Owners Association, Inc. v. Walton County/Intervenor Sandestin Investments, LLC, Case #2017CA225, Circuit Court of Walton County, Florida, by adopting an Amendment to Walton County Ordinance 2017-12." (emphasis supplied). Even so, before the November 7, 2017, meeting, no notice by certified mail was sent to the property owners within 300 feet of the project site.

Four days before the November 7, 2017, meeting SDI and the County entered into an Indemnity Agreement in which SDI agreed to defend and indemnify the County from any legal challenges or actions brought against the County related to or arising from SDI's failure to send notice via mail of the November 7, 2017, Public Hearing. The agreement states that "the Parties disagree as to whether or not SDI should be required to mail certified letters to all owners of property located within the Resort advising them of the November 7, 2017, meeting ('Certified Mailings') . . . ." SDI agreed to hold the County harmless for the cost of a legal challenge to the BOCC's consideration of the Replacement Ordinance at the November 7, 2017, meeting.

The Indemnity Agreement also identified the purpose of the November 7, 2017, public meeting: "WHEREAS, at a regularly scheduled County Commission meeting on October 10, 2017, the Board of County Commissioners scheduled a hearing for November 7, 2017, *in which to consider settlement of the Lawsuits by adopting the Replacement Ordinance.*" (emphasis supplied).

On November 7, 2017, the County held a public hearing at which time the BOCC approved Revised Ordinance 2017-12. Along with approving SDI's NOPC, the BOCC approved the settlement agreement between SOA, SDI, and the County. The ordinance states:

- "The Amended Development Order approved as Revised Ordinance 2017-12 shall replace and supersede all previous Sandestin DRI Development Orders except the 1984 Settlement Agreement . . . ."

7

- "[I]n order to effectuate a settlement of the FLWAC Appeal and the SOA Comp Plan Case, Developer has requested that the Board adopt certain revisions to Ordinance 2017-12."

On December 6, 2017, Osborne filed a civil complaint against the County, seeking "equitable relief, including but not limited to, declaratory relief . . . and related injunctive relief." Osborne alleged that Revised Ordinance 2017-12 is void *ab initio* because the County did not send notice "via mail as required by [the Florida Local Government Development Agreement Act, §§ 163.3220—163.3243, Fla. Stat.], [the Florida Environmental Land and Water Management Act, §§ 380.012—380.08, Fla. Stat.], the Walton County Land Development Code (LDC) and Florida law."

SDI then moved to intervene. The trial court granted the motion.

On February 7, 2018, Osborne filed his First Amended Complaint, alleging that:

- The 1984 Agreement between DCA and a previous owner of the Sandestin DRI is a development agreement.

- The County approved the 1984 Agreement when it adopted Ordinance 89-9.

- Ordinance 89-9 acknowledges that the 1984 Agreement "is the benchmark for all future changes to the Sandestin DRI."

- "The Sandestin DRI [DO] is a 'development agreement' as that term is used pursuant to Florida law."

- SDI's NOPC "sought to change benchmarks and definitions as provided for in the [1984] Development Agreement."

- Ordinance 2017-12 approved SDI's NOPC.

8

- After SOA filed an administrative appeal and civil action against the County, "SOA and SDI entered a settlement agreement concerning SDI's NOPC and the development rights related to the Sandestin DRI."

- Revised Ordinance 2017-12 "made significant and material changes to the development terms, conditions, and rights of SDI."

Notably, Osborne never alleged that the County failed to satisfy the general notice requirements under section 125.66, Florida Statutes.

On February 27, 2018, SDI filed its answer and affirmative defenses. In its fourth affirmative defense, SDI alleged that Osborne received constructive notice of the November 7, 2017, public meeting because the County satisfied the general notice requirements under section 125.66(2)(a), Florida Statutes. SDI also denied that the DRI DO, the 1984 Agreement, and Ordinance 89-9 qualify as development agreements.[5]

In its Fifth Affirmative Defense, SDI asserted that the specific notice requirements under Chapter 163 did not apply to the County's consideration of Revised Ordinance 2017-12 because "[n]either the Sandestin DRI, nor any of the amendments to it, were applied for or approved as Development Agreements pursuant to [The Florida Local Government Development Agreement Act, §§ 163.3220–163.3243, Fla. Stat.]." SDI also

_____

[5] SDI did not address the County's admission in the 2014 DONC that:

- The 1984 Agreement resolved a dispute between the developer and the state land planning agency regarding development rights under the Sandestin DRI;
- Ordinance 89-9 adopted the 1984 Agreement; and,
- Ordinance 89-9 incorporated the 1984 Agreement into the Sandestin DRI DO.

9

argued that section 163.3225, Florida Statutes, only applies to "statutorily defined Development Agreements" and therefore does not apply to DRIs under section 380.06, Florida Statutes.

Even so, SDI admitted that "[d]uring the fall [of] 2017, the SOA and SDI entered [into] a settlement agreement concerning SDI's NOPC and *the development rights related to the Sandestin DRI.*" (emphasis supplied). SDI also admitted that it "sought for the County to approve the terms of the settlement agreement that *related to SDI's development rights related to the Sandestin DRI* via revision to Walton County Ordinance 2017-12." (emphasis supplied).

SDI moved for summary judgment, arguing that Revised Ordinance 2017-12 involved the modification of a development order, not a development agreement. According to SDI, Chapter 163, which pertains to development agreements, can never apply to Chapter 380, which governs DRIs:

> Section 380.06, Florida Statutes, provides the statutory scheme under which DRIs are categorized, evaluated, approved, and amended, including the NOPC procedure. . . . The process outlined in section 380.06 is distinct and materially different that those processes for entering into 'development agreements' found in section 163.3225, Florida Statutes. *In fact, nowhere in section 380.06, Florida Statutes, is the term 'development agreement' used.* Therefore, the NOPC application and approval cannot be categorized as a 'development agreement' as that term is used within section 163.3225, Florida Statutes, and any notice provisions found in section 163.3225 do not apply to the NOPC application submitted by SDI.

(emphasis supplied).

As to public notice, SDI argued that Revised Ordinance 2017-12 did not substantially and materially change Ordinance 2017-12. Thus, no new round of notifications was required under section 125.66, Florida Statutes.

10

In response, Osborne characterized the 1984 agreement as a "development agreement"[6]:

> The Revised Ordinance No. 2017-12 purports, on its face, to adopt the entirety of the NOPC (with minor changes requested by the SOA), including the adoption of the change in the way "open space" was calculated, so as to bring SDI back into compliance with the DRI [DO] and the 1989 Development Agreement.

Osborne also argued that Ordinance 89-9 amended the Sandestin DRI DO by incorporating the 1984 Agreement:

> Changes were made in 1989 in a previous NOPC proceeding, and the County approved the 1989 development agreement by its Ordinance Number 89-9. That ordinance acknowledged that the 1989 action was a "development agreement" which was to be the benchmark for all future changes to the Sandestin DRI/PUD.

According to Osborne, the 1984 Agreement and Ordinance 89-9 control the definition of "open space" for the Sandestin DRI DO. Thus, any change to the definition of "open space" is necessarily a change to a development agreement.

Osborne characterized SDI's argument under section 125.66, Florida Statutes, as "a classic 'straw man' argument" because Osborne never raised such a claim.

Osborne filed a cross-motion for summary judgment, arguing that "the November 7, 2017, approval of the NOPC and of the

---

[6] Osborne referred to the "1989 Agreement." Based on context, it appears that Osborne intended to refer to the 1984 agreement between a previous developer and the state land planning agency. That said, we recognize the possibility that Osborne used that phrase to describe Ordinance 89-9, which adopted the 1984 agreement, as a development agreement between a previous developer and the County.

11

Revised Ordinance failed to strictly comply with the notice requirements and were therefore void."

On November 12, 2020, the trial court heard both summary judgment motions. At the start of the hearing, SDI summarized Osborne's claim as follows:

The argument in the Amended Complaint is that they have laid out three grounds, and one [1] that, under Chapter 163.3225, the notice has been violated. [2] Under Chapter 380 they allege that the notice has been violated without telling you where under th[ere] or what the exact standard is that they allege has been violated. And then [3] they cite you to 10.03.02(d), as in dog, Walton County's Land Development Code, and there are [the] three bases.

SDI asserted that Chapter 380 is the only statutory section that applies to DRIs: "It's important for the Court to keep in mind that Chapter 380 is the *exclusive* statute in Florida which governs DRIs, and it allows the applicant or the declarant to seek changes with the DRI over time in this process." (emphasis supplied).

SDI argued that a DRI development order is not a development agreement. Thus, section 163.3225 did not apply to the County's consideration of Revised Ordinance 2017-12. Nevertheless, SDI characterized the settlement agreement between SOA and SDI as a "very comprehensive settlement agreement concerning all the issues in the NOPC . . . [that came] to the county to get them to approve [it]."

On January 28, 2021, the trial court rendered an order granting SDI's summary judgment motion and denying Osborne's cross-motion. The trial court did not address Osborne's claim that the County failed to comply with the special public notice requirements contained in sections 163.3225 and 380.06, Florida Statutes. Instead, the trial court found that the County did not need to comply with the general public notice requirement under section 125.66, Florida Statutes. The trial court concluded that no new round of notifications was required because Revised Ordinance 2017-12 did not substantially or materially alter the substance of Ordinance 2017-12.

On November 23, 2021, the trial court rendered a Summary Final Judgment for Defendant and Intervenor. Osborne appealed.

The standard of review for this appeal is de novo. *See Dudowicz v. Pearl on 63 Main, Ltd.*, 326 So. 3d 715, 718 (Fla. 1st DCA 2021). The old summary judgment standard applies. *See In re Amends. to Fla. Rule of Civ. Proc. 1.510*, 317 So. 3d 72, 77–78 (Fla. 2021); *Washington v. Fla. Dep't of Revenue*, 337 So. 3d 502, 508 n.1 (Fla. 1st DCA 2022).

## II

Section 125.66(4), Florida Statutes, outlines the minimum procedures that a county must follow to make certain zoning changes through the ordinance enactment process. *See* § 125.66(4), Fla. Stat. (2017). Here, the trial court granted final summary judgment after finding that no new round of notifications was required under that statute. But Osborne never claimed that the County failed to comply with the general notification requirements under section 125.66. Because that question was not before the court, we reverse the final judgment.

## III

We also reverse because the trial court erroneously concluded that Revised Ordinance 2017-12 did not constitute a substantial or material change to Ordinance 2017-12. In reaching its conclusion, the trial court compared the number of "entitlements" under Ordinance 2017-12 with the number of "entitlements" under Revised Ordinance 2017-12 and found no material change. In doing so, the trial court failed to recognize that Revised Ordinance 2017-12 did something that Ordinance 2017-12 did not: it settled a lawsuit between SOA, the County, and SDI.

### A

Subsection (4)(b) contains the general notification requirements pertinent to this appeal. *See generally Neumont v.*

13

*Fla.*, 451 F.3d 1284, 1286 (11th Cir. 2006), certified question answered sub nom. *Neumont v. State*, 967 So. 2d 822 (Fla. 2007) ("*Neumont*") ("Florida Statutes section 125.66(4)(b) contains the notice requirements for proposed ordinances that change the actual list of permitted, conditional, or prohibited uses within a zoning category. The district court recognized that '[u]nder Florida law, strict compliance with the notice requirements of the state statute is a jurisdictional and mandatory prerequisite to the valid enactment of a zoning measure.' 'Failure to follow the state statutory notice requirements render[s] a zoning ordinance void.'" (citations omitted)).

In *Neumont*, the appellants sought "to invalidate a Monroe County ordinance limiting the use of homes as vacation rentals." *Neumont*, 967 So. 2d at 823. According to the Court, "[t]he County first advertised the [draft] ordinance on November 7-9, 1996." *Id*. The Court noted that the "advertisement included the ordinance's title: 'Modifying the existing prohibition on tourist housing including vacation rentals *in all land use districts*.'" *Id*. (emphasis supplied). The Court highlighted that the "advertisement stated that a first public hearing was scheduled for December 10." *Id*.

At the December 10 hearing, the "board of county commissioners considered a new draft [ordinance that] differed from the advertised draft in several respects . . . ." *Id*. Based on the comments received at the hearing, "the board ordered additional changes." *Id*. at 824.

A month later, the "County advertised a notice of a second public hearing [that] stated the title of the [draft] ordinance, which was the same as the original titles except in one respect." *Id*. Whereas the original title included the phrase "land use districts," the new title used the phrase "residential districts." The following table illustrates the differences between the two titles.

| Original Title | New Title |
|---|---|
| "Modifying the existing prohibition on tourist housing including vacation rentals in all *land use districts*." (emphasis supplied) | "Modifying the existing prohibition on tourist housing including vacation rentals in all *residential districts*." (emphasis supplied) |

14

On review, the Court adopted the "general purpose standard" and held that "changes to an ordinance during the enactment process are only 'substantial or material' if they change the ordinance's general purpose." *Id.* at 823. Only a "substantial or material" change would require the notification process to "start from scratch." *Id.*

The Court noted that "the County considered several versions of the ordinance." *Id.* at 826. And the Court found that "[b]etween the first published notice in November 1996 and the final public hearing in February 1997, the County altered the list of land use districts where vacation rentals were permitted." *Id.*

Even so, the Court determined that "the change in the advertised title was not substantial or material" because the second title limited "the scope of the ordinance." *Id.* at 831 (emphasis supplied). Whereas the "first advertised title provided notice to all zoning districts . . ., the second advertised title only provided notice to residential zoning districts." *Id.* Because the phrase "all land use districts" necessarily includes "all residential districts," "[b]oth [advertised] titles put residential district residents on notice of the zoning change that was ultimately adopted." *Id.* Finally, the Court noted that "[o]ur opinion might differ if the second advertised title had broadened, rather than limited, the scope of the ordinance." *Id.*

B

Here, the trial court concluded that Revised Ordinance 2017-12 did not substantially or materially alter the substance of Ordinance 2017-12. But the trial court's conclusion is inconsistent with *Neumont*. Contrary to the situation in that case, the second advertised notice in this case included something substantial and material that the first advertised notice did not, to wit: the County's consideration of the settlement agreement between SOA and SDI. According to the trial court, the County conducted the public hearing in November, at least in part, "for the purpose of discussing the proposed settlement agreement and for ratifying the settlement agreement reached between SOA and SDI (and the County)." The trial court also found that agreement "resolved all

issues between SOA, SDI, and Walton County." In other words, the trial court determined that the County conducted a hearing to decide whether it should enter into an agreement between SOA and SDI that settled a legal dispute between SOA, SDI, and the County.[7]

Under any *Neumont* analysis, whether Revised Ordinance 2017-12 reduced the number of SDI's "entitlements" under the Sandestin DRI DO remains irrelevant. Because it addressed both the NOPC and the settlement agreement, the scope of Revised Ordinance 2017-12 was broader than the scope of Ordinance 2012-17. Consequently, the January advertisement did not put impacted homeowners on notice of what the County considered during the November public meeting. *See Neumont*, 967 So. 2d at 831 ("Our opinion might differ if the second advertised title had broadened, rather than limited, the scope of the ordinance."). The following table lists the notices side-by-side:

| Notices published on January 19 and January 26, 2017 | Notices published on October 26 and November 2, 2017 |
|---|---|
| "Sandestin Investments, LLC, is requesting a determination that their application for a Notice of a Proposed Change (NOPC) to the previously approved Sandestin Development of Regional Impact (DRI) constitutes a non-substantial deviation under subsection 380.06(19), Florida Statutes." | "Sandestin Investments, LLC, is requesting to amend Ordinance 2017-12, to a previously approved Development of Regional Impact, section 380.06(19), Florida Statutes... *The purpose of the hearing is to consider settlement of the pending lawsuit* styled Sandestin Owners Association, Inc. v. Walton County/Intervenor Sandestin Investments, LLC, |

---

[7] The Indemnity Agreement between SDI and the County further proves this point: "WHEREAS, at a regularly scheduled County Commission meeting on October 10, 2017, the Board of County Commissioners scheduled a hearing for November 7, 2017, *in which to consider settlement of the Lawsuits by adopting the Replacement Ordinance.*" (emphasis supplied).



| | Case #2017CA225, Circuit Court of Walton County, Florida, by adopting an Amendment to Walton County Ordinance 2017-12." (emphasis supplied). |
|---|---|

Because of the difference in purpose between Ordinance 2017-12 and Revised Ordinance 2017-12 (as reflected by the differences in the advertised purposes), the County's consideration of Revised Ordinance 2017-12 triggered the requirement for a new round of notifications under section 125.66, Florida Statutes. *See Neumont*, 967 So. 2d at 823.

In this case, however, the trial court did not analyze whether the actual notice provided by the County prior to its consideration of Revised Ordinance 2017-12 satisfied the requirements of section 125.66(4)(b), Florida Statutes; instead, the trial court granted final summary judgment after finding that no new round of notifications was required under that statute.

But Osborne never alleged that the County failed to comply with 125.66(4)(b), Florida Statutes; therefore, we do not address whether Revised Ordinance 2017-12 is void for failure to satisfy the general public notice requirements under that statute. *See Webb v. Town Council of Town of Hilliard*, 766 So. 2d 1241, 1244 (Fla. 1st DCA 2000) ("Attempts of local government to grant zoning changes without compliance with procedural requirements have been deemed invalid and void.").

IV

The trial court committed reversible error when it granted Appellees' motion for summary judgment. At least in part, the trial court based its decision on an issue not before the court. To the extent that issue did apply, the trial court reached the wrong conclusion. The trial court also committed reversible error when it denied Osborne's cross-motion for summary judgment. By responding to SDI's strawman argument, the trial court never

17

addressed the actual claims raised by Osborne. Therefore, we REVERSE and REMAND.

ROWE and NORDBY, JJ., concur; WINOKUR, J., concurs with opinion.

––––––––––––––––––––––––

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

––––––––––––––––––––––––

WINOKUR, J., concurring.

I fully concur with the decision to reverse the trial court's order granting SDI's motion for summary judgment. I write separately, however, to address two concerns: (1) both the County and SDI misstated the law; and (2) the trial court misapplied the law. In the opinion that follows, I trace the history of the Sandestin DRI, discuss development agreements and DRI's generally, identify the misstatements of law by the County and SDI, address rendition and forum, and then list a series of legal questions that the trial court should address on remand.

I

In 1976, the County approved the original Application for Development Approval ("ADA") and issued the first development order ("the 1976 DO") for the Sandestin DRI. Forty years later, SDI would argue that its development rights were governed by the original 1976 DO, not any subsequent modification.[1]

---

[1] On July 8, 2014, the County issued a DONC to SDI, which described as meritless SDI's argument that the 1976 DO provides the benchmark for all modifications to the Sandestin DRI:

The Developer raises several issues as to these deficiencies. The first is that the benchmark standard

18

In 1984, after bankruptcies splintered ownership, the Sandestin Corporation reestablished unified development control over the Sandestin DRI and filed a NOPC application. *See* § 380.06(17)(a), Fla. Stat. (1983) ("A developer shall submit proposed changes to a development of regional impact previously approved pursuant to this section to the local government for a substantial deviation determination.").

The County approved the 1984 NOPC application as a non-substantial deviation and issued an amended DO for the Sandestin DRI ("the 1984 DO"). *See* § 380.06(17)(a), Fla. Stat. (1983) ("The local government shall review the proposed changes pursuant to the criteria enumerated in this subsection and shall make a substantial deviation determination.").

In a 2004 en banc decision, this Court described substantial and non-substantial DRI DO deviations as follows:

> [A] substantial deviation is a change that, per se, creates reasonable likelihood that it will have a substantial effect on the health, safety or welfare of citizens of more than one county. Such a change is automatically required to undergo a new DRI review. Changes which meet this classification are expressly delineated. *See* § 380.06(19)(a)-(c), (e), Fla. Stat. (2001).
>
> All other changes, whether statutorily enumerated or not, would be classified as "not a substantial deviation." *See* § 380.06(19)(e), Fla. Stat. (2001). Logically, because the changes in this case do not have regional (i.e., multi-county) impact, they are not required

that is to be applied is the 1976 original Development Order and not the 1984 Agreement. In essence, the Developer suggests that it is entitled to the development rights that were originally granted when the DRI was approved but that it may ignore all of the prior changes that have occurred over the years. This position lacks merit.

19

to undergo a new development of *regional* impact review process.

Here, the parties stipulated that Appellant's proposed changes fall within this second classification. Although not a term used in the statute, the parties label the proposed changes "non-substantial." This label mainly serves as a convenience to indicate the project does not have a *regional*, or multi-county impact. The term does not lead to a conclusion that the proposed changes are minor, of no significance, or exempt from the Bay County Comprehensive Plan.

*Bay Point Club, Inc. v. Bay Cnty.*, 890 So. 2d 256, 258 (Fla. 1st DCA 2004) (en banc) (citation omitted).

When the County transmitted the 1984 DO to the Florida Department of Community Affairs ("DCA") as the state land planning agency at the time, DCA questioned the County's determination that the NOPC did not request a substantial deviation to the 1976 DO. *See* § 380.06(17)(a), Fla. Stat. (1983) ("The local government shall, at the conclusion of local review, modify the development order to reflect approved changes to the development and shall notify the regional planning agency and the state land planning agency of the changes to the development order, with the findings subject to the appeal provisions of s. 380.07."); *cf. Bartecki v. Dep't of Cmty. Affs.*, 498 So. 2d 972, 974 (Fla. 1st DCA 1986) ("Despite appellants' prodigious and successful efforts in obtaining development approval from the county, the Department of Community Affairs (Department) appeared on the scene to challenge the county's action, wielding its sword of authority afforded by section 380.07(2), Florida Statutes, to appeal to the Commission any development order affecting any area of critical state concern.").

On October 12, 1984, the Sandestin Corporation and DCA entered into an agreement ("the 1984 Agreement") whereby DCA agreed not to seek administrative review of the County's non-substantial deviation determination; in exchange, the Sandestin Corporation agreed to provide DCA with a complete copy of its files for the Project ("the 1985 Developer Submittals"). *See* § 380.07,

Fla. Stat. (establishing an administrative appeal process with FLWAC).

In pertinent part, the 1984 Agreement states: "Future substantial deviation determinations shall be made in reference to the 1984 Master Plan as supplemented with [the 1985 Developer] submittals . . . ."

On August 29, 1989, the County adopted Ordinance 89-9, which amended the Sandestin DRI DO. The Ordinance recognized and incorporated the 1984 Agreement as part of the Sandestin DRI DO. Additionally, Ordinance 89-9 acknowledged that the 1984 Agreement serves as the benchmark for all future changes to the Sandestin DRI DO.

Ordinance 89-9 also states that "[t]he terms and conditions of this Ordinance shall insure [sic] to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of Sandestin Corporation."[2]

"In 1998, Sandestin Corporation conveyed its assets and assigned its rights under the DRI order in turn to Intrawest Sandestin Company, L.L.C. In March of 2010, Intrawest Sandestin sold its assets and assigned its rights under the DRI order to Sandestin Investments, LLC." *Howard v. Murray*, 184 So. 3d 1155, 1159 n.5 (Fla. 1st DCA 2015).

In 2012, SDI filed it's 2011 Annual Report. The County objected to the report for the following reasons:

> The format of the report was contrary to that which had been submitted in the past. Though the 1984 Agreement, as approved by Ordinance 89-9, had defined how all land uses, including open space, would be reported, the methodology utilized in the 2011 Annual Report did not meet this requirement.

---

[2] This language comes from the 2014 DONC issued by the County to SDI.

21

The 2011 Annual Report did not comply with the requirements of the 1984 Agreement, as approved by Ordinance 89-9, in that the 1984 Agreement had required that open space parcels be labeled as stand-alone parcels and that large tracts of open space be counted towards preservation, green space and recreational spaces. However, the Developer's modified reporting methodology substantially changed this approach and included as open space not only stand-alone parcels and large tracts that had been included under the 1984 Agreement, but small areas drawn from residential and commercial parcels. It also greatly expanded the extent of roadways which were considered as open space beyond what was authorized by the 1984 Agreement. Additionally, the 2011 report modified the classification of non-residential uses and treated all such property as commercial, regardless of the specific uses that the property had been classified in the past. *All these land use changes were unilaterally made by the Developer without the approval of the Board . . . .*

(emphasis supplied).

At a hearing held on June 6, 2014, the County determined that SDI was not in compliance with the Sandestin DRI DO. Additionally, the County found that SDI's noncompliance created regional impacts that had not been addressed. This decision was based in part on a deficiency in open space acreage. Pursuant to section 380.06, Florida Statutes, the County directed that no further permits, approvals, or extension of services could be provided to SDI until the Sandestin DRI was brought back into compliance with the DO. *See* § 380.06(17), Fla. Stat. (2014) ("Local governments shall not issue any permits or approvals or provide any extensions of services if the developer fails to act in substantial compliance with the [DRI] development order.").

On July 8, 2014, the County issued a DONC to SDI. In the determination, the County found that SDI improperly inflated the open space acreage by "completely changing the manner that open space was calculated, including adding inappropriate areas in the

calculation and *doing so without seeking approval of the Board.*" (emphasis supplied).

The majority opinion in this case outlines the facts from the 2014 DONC all the way to Osborne's notice of appeal.

II
A

The term "development agreement" is not defined by statute in Florida; nevertheless, appellate courts have relied on a law review article to define that term as "a contract between a [local government] and a property owner/developer, which provides the developer with vested rights by freezing the existing zoning regulations applicable to a property in exchange for public benefits." *Morgran Co. v. Orange County.*, 818 So. 2d 640, 643 (Fla. 5th DCA 2002) (quoting Brad K. Schwartz, *Development Agreements: Contracting for Vested Rights*, 28 B.C. ENV'T AFF. L. REV. 719 (Summer 2001)); *see also Citizens for Responsible Dev., Inc. v. City of Dania Beach*, 358 So. 3d 1, 10 (Fla. 4th DCA 2023) (Warner, J., dissenting) (quoting same).

The Florida Local Government Development Agreement Act supports this view of a development agreement as a regulatory freeze that provides certainty for local governments and landowners. *Compare* § 163.3233(1), Fla. Stat. ("The local government's laws and policies governing the development of the land at the time of the execution of the development agreement shall govern the development of the land for the duration of the development agreement.") *with* Robert M. Rhodes & Cathy M. Sellers, *Vested Rights: Establishing Predictability in A Changing Regulatory System*, 20 Stetson L. Rev. 475, 509–10 (1991) ("The most significant benefit of a development agreement for a developer is the opportunity to freeze application of local land use regulations at the time the agreement is executed. . . . The freeze provision supplements, rather than supplants, rights that may vest under the common law, and a developer entering a development agreement does not lose the opportunity to challenge any subsequently adopted changes based on equitable estoppel and vested rights common law principles. The regulatory freeze

23

reduces development risks, protects the value of a project, and enables a developer to more accurately assess project costs.").

Sections 163.3220 and 163.3223 grant "broad authority" for local governments to enter into development agreements. *See* § 163.3220(3), Fla. Stat. (2017) ("In conformity with, in furtherance of, and to implement the Community Planning Act and the Florida State Comprehensive Planning Act of 1972, it is the intent of the Legislature to encourage a stronger commitment to comprehensive and capital facilities planning, ensure the provision of adequate public facilities for development, encourage the efficient use of resources, and reduce the economic cost of development."); § 163.3220(4), Fla. Stat. (2017) ("This intent is effected by authorizing local governments to enter into development agreements with developers, subject to the procedures and requirements of ss. 163.3220-163.3243."); § 163.3223, Fla. Stat. (2017) ("Any local government may, by ordinance, establish procedures and requirements, as provided in ss. 163.3220-163.3243, to consider and enter into a development agreement with any person having a legal or equitable interest in real property located within its jurisdiction."); James R. Brindell et al., *Planned Unit Developments: Securing Judicial and Governmental Approval*, in FLA. ENV'T. AND LAND USE L., Vol. II, Ch. 18 (1994) ("It should be noted that as in some other states the Florida Legislature has granted *broad authority* to local governments to enter into 'development agreements' with developers. F.S. 163.3220 encourages this type of 'agreement' which may be indistinguishable from the outlawed contract zoning." (emphasis supplied)); *see, e.g., Leon Cnty. v. Gluesenkamp*, 873 So. 2d 460, 461 (Fla. 1st DCA 2004) (discussing the terms of a development agreement).

The statutory authority for local governments to enter into development agreements supplements rather than supplants other authorities. *See* § 163.3220(5), Fla. Stat. ("Sections 163.3220-163.3243 shall be regarded as supplemental and additional to the powers conferred upon local governments by other laws and shall not be regarded as in derogation of any powers now existing.").

In addition to the general public notice requirements that may apply under section 125.66(4)(b), Florida Statutes, special public

notice requirements apply when a local government seeks to enter into, modify, or revoke a development agreement. *See* § 163.3225, Fla. Stat. (2017) (requiring "at least two public hearings," advertisement "in a newspaper of general circulation," and a notice of intent "mailed to all affected property owners").

B

"The term 'development of regional impact,' . . . means any development which, because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county." § 380.06(1), Fla. Stat. (2017).

The statutory process for DRI's places additional requirements on developers; it does not supplant other land regulation measures. *See Suwannee River Area Council Boy Scouts of Am. v. State, Dep't of Cmty. Affs.*, 384 So. 2d 1369, 1374 (Fla. 1st DCA 1980) ("Designation of a project as a development of regional impact operates to impose yet another restraint upon the use and development of property, *in addition to those already imposed by state and local regulatory measures*." (emphasis supplied)).

Similar to the regulatory freeze of a development agreement, an approved DRI DO vests a developer with certain development rights. *See Bay Point Club*, 890 So. 2d at 258 ("Once a DRI has been approved, the right to develop pursuant to the terms of the DRI vests. Vesting means development rights obtained through a previously approved DRI are not lost by subsequent changes in the law." (citation omitted)).

However, vesting does not include rights "greater than those originally obtained." *See Bay Point Club*, 890 So. 2d at 258 ("It does not, and cannot, create entitlement to greater rights than those originally obtained. Accordingly, a proposed change jeopardizes vested rights because, by definition, the change seeks different development rights than those development rights originally approved." (footnote omitted)).

III

A

The County erroneously declared in Ordinance 2017-12 that the 1984 Agreement provided SDI with a vested right to make future, non-substantial deviations:

> The Board finds that the 1984 Agreement vested the Developer with the right to adjust land uses internally within the DRI . . . and to shift density and commercial square footage within the DRI . . . *without requiring review for consistency with the Comprehensive Plan. . . .* The 1984 Agreement authorizes the Developer to implement Land Use Adjustments, Like Kind Transfers and Non-Like Kind Transfers, subject only to the singular requirement that the adjustments will not result in significant additional regional impact. *These are vested rights that the NOPC implements and do not constitute a change that is subject to review for consistency with the Walton County Comprehensive Plan.*

(emphases supplied).

By declaring that the 1984 Agreement entitled SDI to make non-substantial deviations "without requiring review for consistency with the Comprehensive Plan," the County misstated the law. *See* § 163.3194(1)(a), Fla. Stat. ("After a comprehensive plan, or element or portion thereof, has been adopted in conformity with this act, *all* development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted." (emphasis supplied)); *see also Imhof v. Walton Cnty.*, 328 So. 3d 32, 37 (Fla. 1st DCA 2021) ("*All* development on land covered by a local government's comprehensive plan, and all action taken by the government regarding that development, must comport with the plan." (emphasis supplied)).

As to future, non-substantial deviations, the 1984 Agreement did not pre-empt local land use regulations. *See Bay Point Club*, 890 So. 2d at 259 ("The language 'and is otherwise approved' [in

26

section 380.06(19)(f)6.] clearly and unambiguously requires a proposed change be subjected to, rather than exempted from, additional local approval even when no further DRI review is necessary.").

By stating that the developer could "adjust the land use . . . provided there is no significant regional impact," the 1984 Agreement did not pre-approve future, non-substantial deviations. *See Bay Point Club*, 890 So. 2d at 259 ("[A developer] has no vested right to the significant development changes proposed. Its only vested development right is in *completing* development authorized by the original DRI.").

In other words, the 1984 Agreement does not provide SDI with vested development rights as to future, non-substantial deviations. As this Court clearly stated in *Bay Point Club*:

> The question before us is: Once a DRI has been approved by the regional planning agency, do all proposed changes not requiring additional regional review become vested development rights, exempt from any local government review and approval? We answer the question "no," and affirm the order of the Florida Land and Water Adjudicatory Commission (FLWAC).

*Id.* at 257.

Rather, the 1984 Agreement simply states that non-substantial deviations (i.e. deviations with no regional impact) fall outside the scope of the Agreement. Hence, local land use requirements—like those found in the comprehensive plan—still apply:

> [A]n approved DRI creates vested rights to complete any development that "has been authorized." *See* § 163.3167(8), Fla. Stat. (2001). Proposed changes that are not required to undergo a new DRI permitting process, must be "otherwise approved" and may be subject to "conditions of approval." *See* § 380.06(19)(f)6., Fla. Stat. (2001). "All development" and "all actions taken in regard to development orders" "shall be consistent"

with the comprehensive plan. *See* § 163.3194(1)(a), Fla. Stat. (2001). Stated more clearly: DRIs previously authorized may be completed, but *changes* must obtain approval, and *must comply with the comprehensive plan*.

*Id.* at 259 (emphasis supplied).

In the order granting SDI's motion for summary judgment, the trial court repeatedly referred to the non-substantial deviations requested by SDI's NOPC as "entitlements." To the extent the trial court found that SDI was entitled to make non-substantial deviations without review for consistency with the Comprehensive Plan, the court erred. *See Id.*

Even if SDI's NOPC only requested non-substantial deviations that did not trigger a public hearing under section 380.06(19)(f), Florida Statutes, those proposed changes were still subject to local land use approval. *Id.*

Furthermore, just as the County's Comprehensive Plan still applies to non-substantial deviations to the Sandestin DRI DO, so too, the notification requirements contained in section 163.3225 also apply—provided the NOPC involves adoption of a new development agreement or the modification of an existing development agreement.

B

Throughout the proceedings below, SDI repeatedly misstated the law by claiming that, when it comes to development agreements and DRI's, never the twain shall meet. *See* RUDYARD KIPLING, THE BALLAD OF EAST AND WEST lines 1-2 ("Oh, East is East, and West is West, and never the twain shall meet, Till Earth and Sky stand presently at God's great Judgment Seat. . . .").

The following are just a few examples of SDI's misrepresentations to the trial court:

- "Section 380.06, Florida Statutes, provides the statutory scheme under which DRIs are categorized, evaluated, approved, and amended, including the

28

NOPC procedure. . . . The process outlined in section 380.06 is distinct and materially different than those processes for entering into 'development agreements' found in section 163.3225, Florida Statutes. *In fact, no where in section 380.06, Florida Statutes, is the term 'development agreement' used.* Therefore, the NOPC application and approval cannot be categorized as a 'development agreement' as that term is used within section 163.3225, Florida Statutes, and any notice provisions found in section 163.3225 do not apply to the NOPC application submitted by SDI." (emphasis supplied).

- "[S]ection [163.3225] deals with development agreements; and *that is a whole separate category* in Florida development agreements or opportunities for developers to come in and go through a process with the county and enter into a development agreement dealing with land. *This is a DRI. This is governed under Chapter 380.*" (emphases supplied).

But just as Kipling also wrote that "there is neither East nor West, Border, nor Breed, nor Birth," so too there is no legal line of demarcation that forevermore separates development agreements from DRI's. RUDYARD KIPLING, THE BALLAD OF EAST AND WEST lines 3-4 ("But there is neither East nor West, Border, nor Breed, nor Birth, When two strong men stand face to face, though they come from the ends of the earth!").

The 2017 version of section 380.06 in effect during the County's consideration of Revised Ordinance 2017-12 proves this point, as it contains several provisions that expressly used the phrase "development agreement."

Most notably, subsection (8) of section 380.06 was entitled "Preliminary *Development Agreements*." § 380.06(8), Fla. Stat. (2017) (emphasis supplied). That subsection provided that "[a] developer may enter into a written preliminary *development agreement* with the state land planning agency to allow a developer to proceed with a limited amount of the total proposed development, subject to all other governmental approvals and

solely at the developer's own risk, prior to issuance of a final development order." § 380.06(8)(a), Fla. Stat. (2017) (emphasis supplied); *see also White v. Metro. Dade Cnty.*, 563 So. 2d 117, 129 (Fla. 3d DCA 1990) ("Section 380.06(8), Florida Statutes, permits a developer to obtain a written preliminary development agreement from the FDCA as a prerequisite to engaging in limited construction of a project which will ultimately trigger DRI review.").

Subsection (8) of section 380.06 also stated that "[f]ailure to timely file an application and to otherwise diligently proceed in good faith to obtain a final development order shall constitute a breach of the preliminary *development agreement*." § 380.06(8)(a)2., Fla. Stat. (2017) (emphasis supplied).

Additionally, subsection (8) provided that "[t]he preliminary *development agreement* may allow development which is . . . ." § 380.06(8)(a)5., Fla. Stat. (2017) (emphasis supplied).

Furthermore, it stated that "[a] notice of the preliminary *development agreement* shall be recorded by the developer in accordance with s. 28.222 with the clerk of the circuit court for each county in which land covered by the terms of the agreement is located." § 380.06(8)(a)10., Fla. Stat. (2017) (emphasis supplied).

Finally, subsection (8) outlined a process for "a developer who no longer wishes to pursue a development of regional impact may propose to abandon any preliminary *development agreement* executed after January 1, 1985." § 380.06(8)(a)11., Fla. Stat. (2017) (emphasis supplied). Thus, contrary to SDI's assertion below, section 380.06 clearly included the term "development agreement."

While 2017 version of section 380.06(8), Florida Statutes, contemplated a development agreement between the state land planning agency and the developer, section 380.032(3) permits the State land planning agency to enter into an agreement separate and distinct from the preliminary development agreement specifically contemplated by section 380.06(8). *See* § 380.032(3), Fla. Stat. (2017) ("The state land planning agency shall have the power and duty to . . . [e]nter into *agreements* with any landowner, *developer*, or governmental agency as may be necessary to

30

effectuate the provisions and purposes of this act or any rules promulgated hereunder." (emphases supplied)).

With its "broad" grant of authority, section 380.032(3) permits the State land planning agency to enter into development agreements with entities beyond just the developer. *See Compass Lake Hills Dev. Corp. v. State, Dep't of Cmty. Affs., Div. of State Plan.*, 379 So. 2d 376, 382 (Fla. 1st DCA 1979) (citing § 380.032(3), Fla. Stat.) ("[W]e see no reason why the expense and effort required to bring this development into compliance with Chapter 380 cannot be minimized under the *broad authority* given to the Department to enter into agreements with any landowner, developer, or governmental agency as may be necessary to effectuate the provisions of the act. (emphasis supplied)); *see also Friends of Everglades, Inc. v. Bd. of Cnty. Comm'rs of Monroe Cnty.*, 456 So. 2d 904, 906 n.1 (Fla. 1st DCA 1984). ("The 'agreement' outlined steps to be taken by the developer, [South Florida Regional Planning Council], Monroe County and the Department [of Community Affairs] so that expeditious review of changes made in the original development order could be had. The basis of the agreement was that all parties would strive for development of a plan which would not amount to a substantial deviation from the original plan for development of [the] Port Bougainville [DRI]. If such a plan could be devised, a resolution and proposed amended development order would be prepared and circulated for review. The county, which was responsible for properly scheduling and noticing public hearings on the issue, would then consider and act upon proposals submitted to it. If the county adopted those proposals, copies of the amended development order were to be furnished to SFRPC and the Department for further review. Finally, if the final plan approved by the county did not differ significantly from draft plans tentatively approved by those agencies, then they would agree not to appeal the amended development order to FLWAC. *Our research indicates that such agreements are not new to the DRI process which has been said to encourage such compromise and informal settlement of issues.*" (emphasis supplied)).

Even though section 380.032(3) does not expressly use the phrase "development agreement," that appears to be what the provision contemplates. *Compare* § 163.3220(4), Fla. Stat. (2017)

("This intent is effected by authorizing local governments to enter into development agreements with developers, subject to the procedures and requirements of ss. 163.3220-163.3243.") *with* § 380.032(3), Fla. Stat. (2017) ("Enter into agreements with any landowner, developer, or governmental agency as may be necessary to effectuate the provisions and purposes of this act or any rules promulgated hereunder.").

Indeed, it appears that the 1984 agreement and Ordinance 89-9 are precisely the type of agreements authorized by section 380.032 and at issue in *Compass Lake Hills* and *Friends of Everglades* – agreements that brought the developer back into compliance with the requirements of Chapter 380 and the DRI DO.

And unlike section 380.06(8), the version of section 380.032 in effect today is the same version that was in effect in 2017. *See* Ch. 72-317, § 1, Laws of Fla. (creating "The Florida Environmental Land and Water Management Act of 1972"); *see also* Ch. 72-317, § 6, Laws of Fla. (establishing Developments of Regional Impact as part of "The Florida Environmental Land and Water Management Act of 1972"); Ch. 77-215, § 1, Laws of Fla. (creating section 380.032(3) as part of "The Florida Environmental Land and Water Management Act of 1972").

Thus, contrary to SDI's misrepresentations of law, state *and* local governments can rely on sections 163.3220 and 380.032, Florida Statutes, to execute development agreements with developers whose development rights are controlled by a DRI DO.

IV
A

The trial court erroneously concluded that, because he failed to challenge Ordinance 2017-12, Osborne forfeited his ability to challenge Revised Ordinance 2017-12:

Failing to avail himself of the opportunity to preserve his objections to [Ordinance 2017-12], Plaintiff is not entitled to bring an objection to [Revised Ordinance 2017-12] approved at the November 7, 2017, BOCC meeting where

32

the revisions did not change the subject or operation of [Ordinance] 2017-12 in any material way.

At least in part, the trial court relied on that conclusion to deny Osborne's cross-motion for summary judgment, stating: "Because of this Court's finding the time for appealing [Ordinance] 2017-12 expired on May 26, 2017, Plaintiff's cross-motion for summary judgment must fail."

In his Initial Brief, Osborne argues that "[t]he trial court erred by holding that the date for challenging [Revised Ordinance 2017-12] occurred before its coming into existence." In the Answer Brief, SDI concedes the trial court's error but argues that the error "is of no consequence" because Osborne only challenged the notification process for—and not the substance of—Revised Ordinance 2017-12. As to rendition and appealability, however, SDI's distinction is one without a difference.

With regard to rendition, the trial court's order granting SDI's motion for summary judgment contains conflicting language regarding finality. On the one hand, the trial court stated that Ordinance 2017-12 was "finalized in substance" on April 11, 2017, suggesting that Ordinance 2017-12 was final prior to the enactment of Revised Ordinance 2017-12. On the other hand, the court suggested that Revised Ordinance 2017-12 was a continuation of Ordinance 2017-12, suggesting that neither ordinance became final prior to the complaint filed by Osborne below.

As to the ability of Osborne to challenge Ordinance 2017-12 specifically, the trial court found the following:

- "The right to challenge approval of 2017-12 expired on May 26, 2017 [which was 45 days after the final order approving 2017-12 was rendered]."

- "The time for Plaintiff to challenge adoption of 2017-12 was May 26, 2017."

- "In the case of 2017-12, the latest an appeal could have been filed was on May 26, 2017."

This language indicates that the trial court viewed April 11, 2017, as the rendition date for Ordinance 2017-12: "Plaintiff thereby seeks to raise issues which are time barred due [to] Plaintiff's failure to timely raise them as required by law upon rendition of the ordinance by the BOCC on April 11, 2017."

Because Osborne failed to file a challenge within 45 days of the date of rendition, the trial court determined that Osborne "is barred from challenging" the approval of Ordinance 2017-12: "The time for Plaintiff to challenge adoption of [Ordinance] 2017-12 was May 26, 2017. By failing to file an appeal to FLAWAC within that time, or with the circuit court within 30 days of approval, Plaintiff is barred from challenging its approval." *See* § 380.07(2), Fla. Stat. ("Within 45 days after [a DRI development] order is rendered, the owner, the developer, or the state land planning agency may appeal the order to the Florida Land and Water Adjudicatory Commission by filing a petition alleging that the development order is not consistent with the provisions of this part.").

According to this line of reasoning, Ordinance 2017-12 was final and unchallengeable well before the enactment of Revised Ordinance 2017-12.

Of note, however, the trial court acknowledged Osborne's argument that SOA's petition for administrative review tolled rendition of Ordinance 2017-12 and therefore tolled the time to challenge that ordinance: "Plaintiff's motion essentially argues that the implementation of 2017-12 which was finalized on April 11, 2017 did not become 'final' as a result of the appeals filed by Intervener which suspended the effective date of the ordinance." *See* § 380.07(4), Fla. Stat. ("The filing of the notice of appeal stays the effectiveness of the order until after the completion of the appeal process.").

Additionally, the court acknowledged that SOA's petition enjoyed some effect on Ordinance 2017-12, stating: "By operation of § 380.07 (4) Fla. Stat., the implementation of 2017-12 was stayed pending the outcome of the appeals."

34

Nevertheless, the trial court found that SOA's petition for administrative review did not toll the time to challenge Ordinance 2017-12: "nor does this Court find that under the facts of this case that the November 7, 2017, hearing extended the time to file an appeal of 2017-12 as it was finalized in substance on April 11, 2017."

Rejecting the argument that SOA's petition for administrative review tolled rendition of Ordinance 2017-12, the court found that Osborne lost his ability to challenge that ordinance, stating: "In this case, even if the revisions to Co. Ord. 2017-12 had not been adopted as requested, what would remain is the version of 2017-12 approved by the BOCC on March 13, 2017 for which *no appeal remains*." (emphasis supplied).

In reaching this conclusion, the trial court did not address whether, without the enactment of Revised Ordinance 2017-12, the time for challenging Ordinance 2017-12 would have started anew when SOA withdrew its petition for administrative review. *Cf. Rice v. 1989 Ford Bronco; Fla. Tag: HNM 33P; VIN: 1FMCU12T6KUC74759*, 609 So. 2d 639, 639 (Fla. 2d DCA 1992) (holding that a timely and authorized motion for rehearing which was withdrawn on the day the appellant filed a notice of appeal nonetheless tolled rendition until it was withdrawn); *cf. also Simpson v. Simpson*, 780 So. 2d 985 (Fla. 5th DCA 2001) (holding that the time for filing an appeal begins to run anew from the date a party withdraws a timely and authorized motion for rehearing that suspended rendition).

At first glance, the rendition date for Ordinance 2017-12 might appear irrelevant for the purposes of this appeal. However, the trial court found that, because he failed to timely challenge the enactment of Ordinance 2017-12, Osborne lost his ability to challenge the enactment of *Revised* Ordinance 2017-12.

It appears that the court reached that conclusion based on a belief that Revised Ordinance 2017-12 was nothing more than a continuation of Ordinance 2017-12: "The BOCC's consideration of revisions to 2017-12 on November 7, 2017 to conform its language to the provisions of the SOA/SDI Settlement Agreement did not create a 'new version' of the ordinance with was substantially or

materially different so as to require a new round of notices be provided."

But instead of concluding that the continuation extended the time to challenge Ordinance 2017-12, the court found that the time for challenging Revised Ordinance 2017-12 expired when the time for challenging Ordinance 2017-12 expired – even though, according to the court, the time for challenging Ordinance 2017-12 expired before the enactment of Revised Ordinance 2017-12.

Under the facts of this case, however, the trial court cannot have it both ways. By identifying April 11, 2017, as the rendition date for Ordinance 2017-12, and by concluding that Ordinance 2017-12 was "finalized in substance" prior to enactment of Revised Ordinance 2017-12, the trial court strongly suggested that Ordinance 2017-12 and Revised Ordinance 2017-12 involved separate enactments with separate opportunities for Osborne to raise a challenge (setting aside the question whether SOA's petition tolled the time to raise a challenge).

In other words, if Osborne could not challenge Ordinance 2017-12 because that ordinance was final and complete well before the November 7, 2017, public meeting, then Revised Ordinance 2017-12 would appear to be a separate ordinance that triggered a new opportunity for Osborne to file a challenge.

However, by characterizing Revised Ordinance 2017-12 as a continuation of Ordinance 2017-12, the trial court suggested that the two ordinances involved a single enactment process with a single opportunity to raise a challenge, an opportunity that never expired under the facts of this case. Either way, Osborne never lost his ability to challenge Revised Ordinance 2017-12.

Put another way, if Revised Ordinance 2017-12 was a continuation of the Ordinance 2017-12 enactment process, and/or if SOA's notice of appeal tolled rendition of Ordinance 2017-12, then it does not appear that Osborne ever lost his ability to challenge the culmination of that process: the County's adoption of Revised Ordinance 2017-12.

B

36

In its order granting summary judgment, the trial court erroneously stated that an administrative appeal under section 380.07(2), Florida Statutes, provides the exclusive means to challenge a DRI: "[Section 380.07(2), Florida Statutes] establishes the exclusive means to challenge DRI's and any such challenge must be brought *within forty-five (45) days* of rendition of the local action."

The trial court recognized the statutory authority for filing a "comp plan challenge" under section 163.3215, Florida Statutes. However, SDI argued below that "the sole method, for appealing *any* decision by the county dealing with DRI's, are found in [section 380.07]." (emphasis supplied). The trial court appeared to agree with SDI, at least in part, by separating a "comp plan challenge" from any other legal challenge involving a DRI.

But during the hearing on a motion for protective order, the trial court stated that "the only way to bring an appeal is through FLWAC is [Chapter] 380." And during the hearing on the motions for summary judgment, the trial court stated that "Chapter 380 is the *exclusive* means dealing with development of regional impact or DRI as opposed to, you know, local that wasn't part of the DRI." (emphasis supplied).

To the extent the trial court determined that an administrative appeal under section 380.07(2) provides the "exclusive" means for Osborne to challenge the process by which the County amended the Sandestin DRI DO, the trial court erred. *See Suwannee River Area Council Boy Scouts of Am.,* 384 So. 2d at 1374; *see also Friends of Everglades*, 456 So. 2d at 908.

In its order, the trial court also did not acknowledge that the Sanedestin DRI DO is a local government development order just like any other. *See Edgewater Beach Owners Ass'n, Inc. v. Walton Cnty.*, 833 So. 2d 215, 221 (Fla. 1st DCA 2002) ("A DRI development order is a 'final local development order,' just as a building permit or zoning decision is.").

Additionally, the trial court did not acknowledge the type of action authorized by section 380.07(2)—an administrative

challenge to a local government's decision that denies DRI development approval or fails to adequately address regional impacts. *See Friends of Everglades, Inc.*, 456 So. 2d at 911 ("Chapter 380 provides for notice and hearing at the local level and then provides for [administrative] review by the FLWAC if the developer or property owner believes local authorities have acted improvidently in denying an application for development approval, or if the regional or state planning agencies believe that the public's interests will not be served by the local government's approval of a plan for development.").

As the 1984 Agreement in this case illustrates, the local government's decision often involves a determination whether a requested deviation to an existing DRI DO qualifies as substantial (regional impacts) or non-substantial (no regional impacts). *See* § 380.06(19), Fla. Stat.; *see also Bay Point Club*, 890 So. 2d at 258.

That is a specific determination, with a specific administrative review mechanism under section 380.07(2), Florida Statutes. *See Londono v. City of Alachua*, 438 So. 2d 91, 93 (Fla. 1st DCA 1983) ("Appellants therefore have no statutory standing to complain to the Commission that Alachua's development order insufficiently protects regional interests; that function is reserved, as [*Caloosa Prop. Owners Ass'n, Inc. v. Palm Beach Cnty. Bd. of Cnty. Comm'rs*, 429 So. 2d 1260, 1264 (Fla. 1st DCA 1983)] holds, to the designated governmental bodies whose responsibility it is to protect those regional issues.").

Here, Osborne does not challenge that determination. Rather, he challenges the notification procedures followed by the County prior to that determination.

Section 380.07(2) does not preclude an adjoining landowner from challenging "a zoning decision that forms a part of or that is related to a development order." *Caloosa Prop. Owners Ass'n*, 429 So. 2d at 1264–65.

Nor does the availability of an administrative remedy under section 380.07(2), Florida Statutes, preclude an individual from raising a circuit court challenge to the process by which a local government amends a DRI DO. *See Friends of Everglades, Inc.*,

38

456 So. 2d at 909 (finding that parties "would have, at the very minimum, standing in circuit court to challenge *procedural* irregularities in zoning decisions" relating to a DRI).

Therefore, Osborne's failure to join SOA's petition for administrative review (to the extent he could do so) did not preclude Osborne from challenging, in circuit court, the process by which the County enacted Revised Ordinance 2017-12.

Finally, the trial court did not acknowledge that section 380.07(2) only authorizes a limited class of challengers. *See* § 380.07(2), Fla. Stat. (2017) (limiting the class of challengers to "the owner, the developer, or the state land planning agency"); *see also Grand Dunes, Ltd. v. Walton Cnty.*, 714 So. 2d 473, 474 (Fla. 1st DCA 1998) ("[I]n clear terms, section 380.07(2) permits only 'the owner, the developer, or the state land planning agency' to appeal a DRI development order to FLWAC.").

Under this Court's precedent, that class of challengers can include a homeowners' association. *See Edgewater Beach Owners Ass'n, Inc.*, 645 So. 2d at 543 (finding that a homeowners' association "is an 'owner' under the terms of Section 380.07(2), and therefore has standing to appeal the amended development order rendered by the Board of County Commissioners").

However, that class of challengers does not include an individual like Osborne who owns a home in a previously developed portion of a DRI. *See Caloosa Prop. Owners Ass'n.*, 429 So. 2d at 1264 ("The legislature, in enacting this statute, did not refer to '*an* owner' or to '*any* property affected by such order.' Rather, the legislature referred to *the* property that is the subject of the Chapter 380 review and to the owner of that property."); *see also Londono*, 438 So. 2d at 93 ("These appellants, owning lots within the designated DRI but not proposed thereby for development, are in the same position as was the *Caloosa* association of property owners adjoining the proposed DRI.").

Osborne specifically argued this point below, stating: "the only parties who may pursue the appeal [to FLWAC] are the owners of the property on which the DRI is located, the developer, the regional planning council, and the local land planning agency."

Nevertheless, the trial court erroneously concluded that, by "failing to file and preserve the objection to the ordinance," Osborne lost his ability to challenge the enactment process.


V
A
*Is the 1984 Agreement a Development Agreement?*

In the 2014 DONC, the County stated that the 1984 Agreement "resolved the Department's threatened appeal of Walton County's determination that the proposed Master Plan did not constitute a substantial deviation." Despite the County's admission, the trial court did not address whether the 1984 Agreement is a development agreement under section 380.032, Florida Statutes.

Because it resolved a dispute between a developer and the state land planning agency as to whether proposed deviations to the Sandestin DRI DO were substantial or non-substantial, the 1984 Agreement may qualify as a development agreement. *See generally Compass Lake Hills*, 379 So. 2d at 382 (citing § 380.032(3), Fla. Stat.). On remand, the trial court should answer that question.


B
*Is Ordinance 89-9 a Development Agreement?*

In the DONC, the County admitted that Ordinance 89-9 approved the 1984 Agreement. Despite the County's admission, the trial court did not address whether, upon adoption of Ordinance 89-9, the County became a party to a development agreement (i.e., the 1984 Agreement). *See Friends of Everglades, Inc.*, 456 So. 2d at 906 n.1. On remand, the trial court should answer that question.

## C
### *Is the DRI DO is a Development Agreement?*

In the DONC, the County admitted that Ordinance 89-9 incorporated the 1984 Agreement into the Sandestin DRI DO; additionally, the County described as meritless SDI's argument that the 1984 Agreement does not serve as the benchmark for all future changes to the Sanestin DRI DO.

Despite the County's admission, the trial court did not address whether, by incorporating the 1984 Agreement, the Sandestin DRI DO itself became a development agreement. On remand, the trial court should answer that question.

## D
### *Did Ordinance 2017-12 Modify an Existing Development Agreement?*

In Ordinance 2017-12, the County admitted that SDI submitted the NOPC to "amend the Sandestin Development of Regional Impact ('DRI') Development Order." Additionally, the trial court found that the "NOPC sought changes to the *benchmarks* and definitions as provided for in the Sandestin [DRI DO]." (emphasis supplied). The trial court also found that Ordinance 2017-12 "adopted certain, requested changes to the Sandestin DRI Development Order." Furthermore, the County admitted in Ordinance 2017-12 that the ordinance is an "Amended Development Order."

Despite all of that, the trial court never addressed whether Ordinance 2017-12 modified an existing development agreement (i.e., the 1984 Agreement, Ordinance 89-9, and/or the Sandestin DRI DO). On remand, the trial court should answer that question.

## E
### *Is Ordinance 2017-12 a New Development Agreement?*

In Ordinance 2017-12, the County admitted that approval of SDI's NOPC terminated the County's enforcement action. Despite the County's admission, the trial court did not address whether

Ordinance 2017-12 qualifies as a new development agreement between SDI and the County.

As part of its monitoring responsibility, the County reviewed the annual reports submitted by SDI and concluded that the Sandestin DRI was not in compliance with the open space requirements contained in the 1984 Agreement. The County issued the DONC to SDI; and in response, SDI submitted the NOPC.

An important point not addressed by the trial court, SDI did not request a change to the definition of "open space" prior to the DONC. In other words, SDI did not pursue a prospective change that opened the door for future development; rather, SDI sought a retrospective change that closed the door to an ongoing enforcement action. In other words, SDI did not seek a legislative change independent of the County's quasi-judicial, enforcement action.

Consequently, Ordinance 2017-12 does not represent the culmination of the typical give-and-take process whereby a developer successfully obtains modification of a development order. *See generally Pres. Palm Beach Pol. Action Comm. v. Town of Palm Beach*, 50 So. 3d 1176, 1179 (Fla. 4th DCA 2010) (recognizing that "an order, by definition, is often unilateral and non-negotiable," but that "development orders are often the product of negotiations between a developer and a municipality").

In this case, the County was acting in an enforcement or quasi-judicial capacity when it issued the DONC and considered the NOPC. *See Lee Cnty. v. Sunbelt Equities, II, LTD.*, 619 So. 2d 996, 1000 (Fla. 2d DCA 1993) ("Placed in the zoning/code enforcement context, the court or agency asks: 'Has the party done something in violation of the law?' or 'Will the law allow the party to do what it wants?' By contrast, legislation changes the existing law. Arguably, it is immaterial whether such change stems from the fiat of the governing body (e.g. a comprehensive rezoning) or from an individual request to 'change the law for me' (the Snyder/Sunbelt rezonings)."); *see also Hirt v. Polk Cnty. Bd. of Cnty. Comm'rs*, 578 So. 2d 415, 417 (Fla. 2d DCA 1991) ("Whether a board's zoning decision is considered legislative or quasi-judicial

appears to turn on whether the local governmental body is enacting an ordinance, in which case it is acting legislatively, or enforcing it, in which case it may be acting quasi-judicially.").

By approving the NOPC and withdrawing the DONC, the County resolved a dispute regarding the "appropriate" definition of "open space" for the Sandestin DRI DO. The resolution of that dispute—in the form of Ordinance 2017-12—may qualify as a new development agreement between SDI and the County. On remand, the trial court should answer that question. *Cf. Compass Lake Hills*, 379 So. 2d at 382 (citing § 380.032(3), Fla. Stat.) (recognizing a development agreement as a means to bring a developer back into compliance with applicable land use regulations).

F
*Did Revised Ordinance 2017-12*
*Modify an Existing Development Agreement?*

If the 1984 agreement, Ordinance 89-9, or the Sandestin DRI DO qualify as a development agreement, then, for all the same reasons that Ordinance 2017-12 modified an existing development agreement, so too Revised Ordinance 2017-12 modified one.

Additionally, if Ordinance 2017-12 qualifies as a new development agreement (because it resolved a quasi-judicial, enforcement action involving development rights), then Revised Ordinance 2017-12 may have modified another development agreement, to wit: Ordinance 2017-12.

If either is so, then the County's consideration of Revised Ordinance 2017-12 may have triggered the special public notice requirements that apply when a local government seeks to modify an existing development agreement. On remand, the trial court should answer that question.

G
*Is Revised Ordinance 2017-12*
*a New Development Agreement?*

SDI and the County admitted that Revised Ordinance 2017-12 resolved a legal dispute involving development rights under the

Sandestin DRI; and, the trial court expressly found so. Despite all of that, the trial court never addressed whether Revised Ordinance 2017-12 qualifies as a new development agreement.

In its answer to Osborne's complaint, SDI admitted that "[d]uring the fall [of] 2017, the SOA and SDI entered [into] a settlement agreement concerning SDI's NOPC and *the development rights related to the Sandestin DRI.*" (emphasis supplied). Additionally, SDI admitted that it "sought for the County to approve the terms of the settlement agreement that *related to SDI's development rights related to the Sandestin DRI* via revision to Walton County Ordinance 2017-12." (emphasis supplied).

During the hearing on the motion for summary judgment, SDI characterized the settlement agreement between SOA and SDI as a "*very comprehensive settlement agreement concerning all the issues in the NOPC . . . .* [that came] to the county to get them to approve [it]." (emphasis supplied).

Likewise, the Indemnity Agreement identified the purpose of the November 7, 2017, public meeting as follows: "WHEREAS, at a regularly scheduled County Commission meeting on October 10, 2017, the Board of County Commissioners scheduled a hearing for November 7, 2017 *in which to consider settlement of the Lawsuits by adopting the Replacement Ordinance.*" (emphasis supplied).

The County's public meeting notices provide further proof, as they state: "The purpose of the hearing is to consider settlement of the pending lawsuit styled Sandestin Owners Association, Inc. v. Walton County/Intervenor Sandestin Investments, LLC, Case #2017CA225, Circuit Court of Walton County, Florida, by adopting an Amendment to Walton County Ordinance 2017-12."

Additionally, Revised Ordinance 2017-12 itself states that "*in order to effectuate a settleme*nt of the FLAWAC Appeal and the SOA Comp Plan Case, Developer has requested that the Board adopt certain revisions to Ordinance 2017-12." (emphasis supplied).

Finally, the trial court found that the County conducted a public hearing "on November 7, 2017, for the purpose of discussing the proposed settlement [of SOA's challenge to Ordinance 2017-12] and for ratifying the settlement agreement reached between SOA and SDI (*and the County*)." (emphasis supplied). The trial court even found that the settlement agreement between SOA and SDI concerned "SDI's NOPC *and the development rights* related to the Sandestin DRI." (emphasis supplied).

SDI's admissions, the County's public notices, the language of the ordinance itself, and the trial court's findings illustrate why Revised Ordinance may qualify as a new development agreement: (1) the ordinance adopted a settlement agreement that resolved a legal dispute involving development rights; and, (2) the ordinance brought a developer back into compliance with a development order. *See generally Chung v. Sarasota Cnty.*, 686 So. 2d 1358, 1360 (Fla. 2d DCA 1996) ("[W]e can envision developers filing an unacceptable plan for rezoning, appealing its denial, and then obtaining approval of a modified plan by settlement agreement *before satisfying the public notice and hearing requirements*." (emphasis supplied)).

If it does, then the County's consideration of Revised Ordinance 2017-12 may have triggered the special public notice requirements that apply when a local government enters into a new development agreement. On remand, the trial court should answer that question.

———————————————

Marie A. Mattox and Ashley N. Richardson of Marie A. Mattox, P.A., Tallahassee, for Appellant.

William G. Pafford of Coppins Monroe, P.A., Tallahassee, for Appellee Walton County, Florida; Dana C. Matthews and C. Stephen Tatum of Matthews & Jones, LLP, Destin, for Appellee Sandestin Investments, LLC.